[Crim. No. 19500. June 8, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE ROY HANNON, Defendant and Appellant.

COUNSEL

Barry Adler, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg and John H. Sugiyama, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WRIGHT, J.***—Lee Roy Hannon appeals from a judgment following convictions by jury of attempted robbery (Pen. Code, §§ 211, 664) and assault with a deadly weapon (Pen. Code, § 245, subd. (a)). He contends initially that he was denied his constitutional right to a speedy trial and also argues that the trial court committed prejudicial error by instructing the jurors that they could consider certain evidence as a circumstance tending to show a consciousness of guilt. Although we reject the speedy trial claim, we hold, for the reasons which follow, that the disputed jury

---

*Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

instruction constituted prejudicial error in the circumstances prevailing at trial and accordingly we reverse the judgment.

After closing their restaurant on the night of January 27, 1974, manager Hugh Smith and his assistant, Robert Nalette, left the building through the rear-side door about 10:45. The men separated and each moved towards his vehicle in the parking lot adjoining the restaurant. As Smith reached his pickup truck and unlocked it he heard a voice which directed that he return to the restaurant. Smith saw no one but turned and began to obey the command. As he reached the building he was accosted by a stranger who demanded that he open the rear-side door. When Smith stated that the door could not be opened from the outside, he was told by the stranger to face away from him. As Smith turned, his shoulder was seized and the barrel of a gun was thrust into his back. His assailant once again demanded that the rear-side door be opened. Smith explained that only the front door, which was well lit in contrast to the area in which they stood, could be unlocked from the outside.

The assailant next ordered Smith to advise the other man in the parking lot to join them. After Nalette heard Smith's call, he turned around, observing the profiles of both Smith and the stranger. He walked towards them and, when he was about six feet away, the stranger shot Smith in the back. The assailant ordered Smith and Nalette to open the rear-side door of the building, threatening to shoot the latter also if he did not comply. When Nalette repeated that the door could not be unlocked from outside the building, the assailant said, "I'm giving you five to get out of here," and released his hold on Smith. As Smith moved away the assailant's full face was revealed to Nalette. The assailant disappeared in the darkness before either Smith or Nalette were able to obtain another view of him.

During the encounter Smith saw his assailant's full face for about two or three seconds and also viewed his profile for three to five seconds. He was, however, unable to identify him from "mug" shots exhibited by the police. After defendant's arrest Smith observed a lineup of persons including defendant. He initially identified a man other than defendant, indicating that such person bore a "close resemblance" to his assailant. Because it had been dark on the night of the assault, Smith had been unable to "get a definite reading on the person." He requested that each of the men in the lineup be asked to say, "Open up the door or I will kill you." After hearing all of the men repeat the threat, Smith changed his mind and wrote a note indicating that the man he had tentatively

identified was not his assailant. At trial Smith was unable to identify defendant as his attacker.

Nalette, on the other hand, identified defendant as the assailant on four separate occasions. He testified that he saw the assailant face to face on the night of the incident for about 30 to 45 seconds and viewed his profile for about one and one-half to two minutes, thus accounting for his ability to make the identification. After viewing 200 photographs at the Oakland Police Department two days after the incident occurred, he selected a photograph of defendant. Following defendant's apprehension almost eight months later, Nalette identified him at a lineup. He later identified defendant at the courthouse and again during trial. Although defense counsel questioned Nalette concerning the inconsistencies in his description of the assailant, Nalette was "absolutely sure" of his in-court identification of defendant as that man.

In addition to the testimony of Smith, Nalette and Smith's physician, the People's only other witness was William Leach, an investigator with the district attorney's office. His testimony concerned a brief encounter which he had prior to trial with an individual named Elton Brown, the only witness subsequently called by the defense. A major issue raised on this appeal revolves around the incident with Brown.

Brown, a friend and former roommate of defendant, supplied an alibi for him. Brown testified that he was constantly in the company of defendant on the day and night on which the assault and robbery attempt took place. According to Brown he moved into defendant's apartment about a month before the date of the commission of the alleged crime and resided there about two months. He testified that he had not been asked to recall what occurred on the day of the alleged crime until almost a year later, but was nevertheless able to remember the events of the day in question because it was a Sunday several days before the birthday of his girlfriend and the planning for a birthday celebration had taken place on that particular day. In addition, it was the last Sunday in January and Brown recalled that he had had difficulty about that time concerning the receipt of his income tax withholding statement.

According to Brown, on the day in question he and defendant awoke about 11 a.m. They ate breakfast and spent the afternoon playing chess and dominoes with two friends who came by. After dinner the four watched television. They spent part of the evening in conversation and

Brown testified that he was with defendant in the apartment at 10:45 p.m., the time at which the assault and attempted robbery occurred. Brown further testified that he was constantly in the company of defendant during the crucial day and did not leave defendant's presence until about 1:30 a.m. the next morning.

The prosecutor attempted to impeach Brown's testimony by asking him to recount what occurred on the day preceding January 27. He asked Brown the address of the apartment but Brown was unable to recall the street number, although he indicated the nearest intersection and described the building as pink in color. Near the end of his cross-examination, the prosecutor asked Brown if he had refused to speak to William Leach, the investigator, the previous morning at the courthouse. Brown confirmed that he had so refused. Brown was asked if he had told Leach that an attorney had ordered him (Brown) not to speak to Leach. Brown denied that he had been so ordered, stating that he told Leach that he had talked to "the lawyer" and that he would remain silent until he testified in court. The prosecutor asked a number of other questions all aimed at establishing that defendant's counsel, a public defender, had attempted to suppress evidence by "ordering" Brown not to speak with anyone representing the People. On redirect examination, defendant's counsel attempted to show that Brown's refusal to speak with Leach was a personal decision and was not "ordered" by anyone.[1] When Brown finished his testimony, the defense rested.

---

[1]Relevant excerpts from Brown's testimony are as follows:

"[Prosecutor]: Did you refuse to talk to [Leach]?

". . . . . . . . . . . . .

"[Brown]: I told him that I talked to the lawyer, and what I had to say, I would say what I had to say in court.

". . . . . . . . . . . . . . .

"Q. The last Public Defender you talked to, prior to that refusal, was Mr. Harpham, is that correct?

"A. Yes.

"Q. Did you refuse to talk to Mr. Leach because Mr. Harpham instructed you not to?

"A. No.

". . . . . . . . . . . .

"Q. Yesterday afternoon, did you talk with the Public Defender?

"A. No, I didn't. I was in his office to talk to him.

"Q. Yesterday afternoon—you are not answering the question. Did you talk to the Public Defender yesterday afternoon?

"A. I told you no, and I'm giving my explanation why I didn't talk to him, is because you were there. You came in with the two policemen and they arrested me, so I didn't have a chance to talk to him. [Brown was apparently arrested at the direction of the prosecutor after he refused to speak to Leach. The arrest was based on an outstanding bench warrant issued in relation to several motor vehicle violations.]

". . . . . . . . . . . . .

"Mr. Harpham: Q. Did I ever tell you not to talk to this investigator from the D.A.'s

The People called William Leach as a rebuttal witness. Leach testified that he had spoken with Brown in the courtroom hallway the previous morning. After he had identified his relationship as an investigator with the district attorney's office, Leach had asked Brown if he would answer several questions. Brown had refused, stating that "a[n] attorney" or "his attorney" had ordered him not to speak to representatives of the People. Leach had tried to question Brown once more before Brown testified, this time after Brown was arrested on an outstanding traffic warrant. (See fn. 1, *ante.*) The prosecutor's questions pointedly brought out the fact that Leach had spoken to Brown on the second occasion shortly after Brown had finished speaking with defendant's attorney. Thereafter Brown had again refused to speak with Leach. On cross-examination, defendant's counsel elicited the concession from Leach that he had not asked Brown if he, defense counsel, had ordered Brown not to speak to Leach.[2]

Based on Leach's testimony, the People sought to have the jurors instructed that they could infer a consciousness of guilt on the part of defendant based on defense efforts to suppress evidence if they believed that defendant's counsel had ordered Brown not to speak to Leach. Over

office?
"A. No, and the reason why, he told me—he said it's up to me whether I want to talk to him, or not. It's up to me. He didn't say, don't talk to him.
" . . . . . . . . . . . . . .
"Q. And this is the reason why you refused to talk to Mr. Leach?
"A. Well, on the other hand, you know, I—well, it was the trial and why should I discuss the trial with somebody I don't know? Then, if it's the D.A. and the lawyer is the Public Defender, whatever, that's the only person I talked to, and that's the only person I wanted to talk to, besides me testifying."

[2]Relevant excerpts from Leach's testimony are as follows:
"Q. What did you say to him [Brown]?
"A. I told him that I asked if he was going to testify in the case, and he said yes.
"Q. Then what next did he say?
"A. I asked him, I told him there were a few questions I would like to ask him, concerning the testimony in the case.
"Q. Did he respond to that question?
"A. Yes, he did.
"Q. What did he say?
"A. He stated that he couldn't speak to me, on the orders of his attorney, or a attorney, either one, to not speak to anyone from the prosecution.
" . . . . . . . . . . . . . .
"Mr. Harpham: Q. Did you ask Mr. Brown that I had told him not to talk to you?
"A. I did not.
"Q. . . . . . . . . . . . . . . .
"Mr. Harpham: Q. Well, I will just ask you this: There was nothing that Mr. Brown told you about me telling him not to talk to you, right?
"A. That's correct."

defendant's objection the court instructed the jury on efforts to suppress evidence as showing a consciousness of guilt in the language of a modified CALJIC No. 2.06 instruction.[3] Defendant contends that the giving of such an instruction in this or in any other form on the basis of the record in the instant case constitutes prejudicial error.

Analysis of defendant's jury instruction contention involves consideration of several separate but related subissues. First, we deem it necessary to comment on the form of the instruction given to the jury. Second, we conclude that the record fails to support the giving of even a properly formulated instruction on inferring consciousness of guilt from suppression of evidence on the part of defendant. Finally, we hold that the erroneous instruction on consciousness of guilt constitutes prejudicial error.

We begin our analysis by noting that the instruction given to the jury clearly left open the possibility that *no* evidence of suppression may have been presented.[4] This possibility was injected into the instruction by the trial court's modification of the standard instruction. While modification of the standard instructions is always within the discretion of the trial court, for indeed such instructions are themselves optional within the discretion of the trial court, any modification in those instructions must conform with the applicable law.

■ It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281].) ■ Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference. Further-

---

[3]"Now, evidence, *if there was any in this case,* that the defense attempted to suppress any evidence against the defendant in any manner, may be considered by you, if you find it exists here as a circumstance tending to show a consciousness of guilt. However, such evidence is not sufficient in itself to prove guilt and its weight and significance, if any, are matters for your consideration." (The italicized portion constitutes the trial court's modification of the standard CALJIC No. 2.06 instruction.)

[4]The instruction began: "Now, evidence, *if there was any in this case,* that the defense attempted to suppress any evidence . . . ." (Italics added.)

more, the determination of whether there is such evidence in the record is a matter which must be resolved *by the trial court before* such an instruction can be given to a jury.

In the case before us, the court failed to make the necessary preliminary evaluation and, instead, it chose to modify the standard instruction in a manner which left that determination to the jury. In so doing, the court committed error because such a procedure forced or at the very least permitted the jury to resolve a question of law. We can easily understand that the court hoped to strike a compromise between the People's effort to secure a consciousness-of-guilt instruction and defendant's contention that giving such an instruction in any form would constitute error. Nevertheless, when confronted with such a situation a trial court may not straddle the fence. It is *the court* which must determine whether or not the record contains evidence which, if believed, will support the suggested inference. After making that determination of law, the court should then instruct the jury accordingly.

In summary there was testimony by Leach in the instant case that his efforts to question Brown were unsuccessful, Brown having stated that he, Brown, had spoken with an "attorney" or "his attorney" and would not discuss the case prior to testifying at the trial. Further, Leach conceded that Brown had never said that he had been told to remain silent by defendant's attorney. Based on Leach's brief testimony the People sought to have the jury instructed that it could infer a consciousness of guilt from efforts to suppress evidence adverse to defendant. As a preliminary matter it was the responsibility of the trial court to determine, as a matter of law, whether or not a jury could properly make the suggested inference if it believed Leach's testimony to be true. The modification of the standard instruction supports our conclusion that the court failed to make such a determination.

 The People have failed to produce authority in support of the assertion that such a record supports a consciousness-of-guilt instruction. Nothing in Leach's testimony established that defendant's attorney instructed Brown not to speak to a representative of the People. In fact, Leach conceded on cross-examination that Brown never asserted that such an order had ever been given to him by defendant's attorney. Secondly, even if there had been sufficient evidence that defendant's attorney had instructed or "ordered" Brown to remain silent, the People have failed to produce authority in support of the conclusion that such

conduct rises to the level of suppression or attempted suppression of evidence.

In contrast to the paucity of authority presented by the People, defendant cites *People* v. *Weiss* (1958) 50 Cal.2d 535 [327 P.2d 527], as a case closely on point. In *Weiss* a witness who had an abortion performed on her by one of the codefendants was granted immunity from prosecution and led law enforcement officers to the location where the abortion took place. The next day she received a telephone call from an individual purporting to be the attorney for one of the defendants. The caller questioned the witness and asked if she had been contacted by an investigator from the State Medical Board or if she had been asked to identify the house where the abortion had been performed. At trial the witness was permitted to recount the telephone call incident. When defense counsel moved to strike the testimony on the ground that it was hearsay and by innuendo damaged the defense case, the motion was denied. On appeal the People defended the trial court's ruling on the ground that the evidence was admissible to show that the witness had been "impliedly intimidated" by an agent of the defendants. We held that it was error to receive such testimony based on a theory of an attempted suppression of evidence.

Defendant in the instant case correctly contends that the authority we relied upon in *Weiss* is equally apposite in the present context. " 'Efforts to suppress testimony against himself indicate a consciousness of guilt on the part of a defendant, and evidence thereof is admissible against him. [Citation.] Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant.' " (*People* v. *Weiss, supra,* 50 Cal.2d 535, 554, citing *People* v. *Gilliland* (1940) 39 Cal.App.2d 250, 255-257 [103 P.2d 179], and *People* v. *Burke* (1912) 18 Cal.App. 72, 91-92 [122 P. 435].) As no evidence of authorization was presented in *Weiss,* we held that admission of the evidence was erroneous, although not prejudicial in light of the overwhelming evidence of the defendants' guilt.

As in *Weiss* the record in the present case fails to supply the necessary nexus between defendant and the alleged suppression of evidence. At the very most the record merely supports the conclusion that some uniden-

tified attorney ordered Brown not to speak with representatives of the People before testifying at trial.

*Weiss* holds that the admission of evidence purporting to show suppression or attempted suppression of evidence is erroneous absent the prerequisite of proof that the defendant was present at such an incident or proof of authorization of such illegal conduct. If evidence of alleged suppression is inadmissible on such a record, it is, a fortiori, error to instruct a jury that it can infer a consciousness of guilt if it believes such improperly admitted evidence to be true. The record in the present case is deficient in the same crucial regard as that in *Weiss*. Therefore, all of the evidence on the subject, including portions of Brown's testimony in response to the prosecutor's questions and Leach's testimony was objectionable. ■ However, the failure of defendant's attorney to object to such questions or to move to strike the resulting testimony waived any error. Lack of objection at that time did not, however, waive defendant's right to appellate review of the propriety of the court's jury instruction on the issue of suppression of evidence and consciousness of guilt because the Legislature has specifically provided that an objection is not required in order to preserve instruction issues affecting the substantial rights of a defendant. (Pen. Code, § 1259.) As the record contains no evidence to support the suggested inference, the court erred in giving the instruction.

■ We are of the further view that even if the record had contained proof that defendant's attorney had, in fact, instructed Brown to remain silent prior to trial, such conduct does not necessarily constitute the suppression or the attempted suppression of evidence. We observe preliminarily that the authority previously quoted from *Weiss* states in relevant part: " 'Efforts to suppress testimony *against himself* indicate a consciousness of guilt on the part of a defendant . . . .' " (*People* v. *Weiss,* *supra,* 50 Cal.2d at p. 554, italics added.) The People have never asserted that defendant's counsel attempted to induce Brown not to testify, and indeed, such a contention would be absurd for Brown supplied defendant's alibi. Instead, the essence of the People's argument is that defense counsel attempted to suppress evidence by interfering with the People's pretrial investigation of a potential witness.

Our own research on the foregoing issue has revealed only cases dealing with the converse question, i.e., whether or not the People may order potential witnesses not to speak with a representative of the defendant prior to testifying at trial. In *People* v. *Shaw* (1896) 111 Cal. 171 [43 P. 593], the court was called upon to decide whether a witness

could be impeached for refusing to speak with defense counsel prior to trial after having informed the prosecutor of her knowledge of the case. After holding that such impeachment was proper, the court noted in dictum that the witness had been improperly "ordered" not to speak with defense counsel "under the mistaken notion which some prosecuting officers have that they can *order* persons whom they want as witnesses not to speak to other persons about what they know." (*Id.,* at p. 175.) *Walker* v. *Superior Court* (1957) 155 Cal.App.2d 134 [317 P.2d 130], is consistent with the *Shaw* dictum. In that case the court considered the defendant's pretrial request to view statements made to the sheriff by a witness who subsequently refused to speak to defense attorneys solely because he had been ordered to remain silent by the sheriff. The Court of Appeal concluded that although the trial court could not order the witness to speak to defense attorneys, a court could and should order the sheriff or a prosecutor to rescind an order that witnesses not speak to defense investigators. (*Id.,* at pp. 139-140.)

The conclusions reached in *Shaw* and *Walker* were founded on the defendant's constitutional rights to obtain witnesses to testify in his behalf and to prepare a defense. When an agent of the state such as a police officer or a prosecutor "orders" a witness not to speak to representatives of a defendant, far more harm is likely to result than in the case of a defense attorney who purports to "order" a witness not to speak to the prosecutor for the simple reason that private citizens are more likely to believe that officials are authorized to issue such "orders." In any event, it is manifest that in either case witnesses are free to disregard any order which purports to prohibit them from speaking with representatives of the opposing party. Witnesses and potential witnesses belong to neither side to an adversary proceeding. Within constitutional limitations, access to potential witnesses should remain open to all parties in a legal controversy.

There is an appropriate remedy when a witness refuses to speak about a case with one party's investigator after having previously informed the other party about his knowledge of the case. The remedy is simply impeachment on the basis of bias as was recognized in *People* v. *Shaw, supra,* 111· Cal. 171, 174-175. (Evid. Code, § 785; see, Witkin, Cal. Evidence (2d ed. 1966) Introduction of Evidence at Trial, § 1234, pp. 1139-1140.) Furthermore, impeachment of the witness is an appropriate procedure not because the refusal to discuss the case may have been the result of one party "ordering" such silence but simply because the favoritism shown *by the witness* demonstrates the possibility of bias

on *his* part towards the favored party. The People's contention that such an order by a defendant's attorney constitutes suppression of evidence is without foundation. The refusal of Brown to speak with the People's investigator, for whatever reason, was not an issue which called for the drastic measure sought by the People. The only significant issue raised by the refusal of Brown to discuss the case was that of the credibility of a witness.[5]

■■■ Having concluded that the trial court erred by instructing the jury in the language of the modified CALJIC No. 2.06 instruction, we must assess the effect of that error. The People's case ultimately rested on one key factor, Nalette's identification of defendant as the assailant and attempted robber. There was simply no other evidence which connected defendant with the two offenses. Although Nalette was unequivocal in his identification, Smith, the victim of the shooting who had longer contact with the assailant, could not identify defendant either before or at trial.

Defendant's hopes for acquittal rested on two grounds, the possibility that Nalette's identification testimony had been sufficiently weakened by cross-examination, and the strength of Brown's alibi testimony. Although we have indicated that the prosecutor could have quite properly impeached Brown based on his refusal to speak with Leach, the impeachment of Brown came to be framed in the considerably different context of suppression of evidence. It is one thing to argue that the testimony of a witness may be suspect because that person has refused to speak with a representative from the opposing party; it is quite another thing to argue that a witness has refused to speak with someone from the

---

[5]It is apparent that the issue of suppression of evidence arose out of the prosecutor's concern that Brown might present alibi evidence which could not be impeached effectively on short notice. In actuality the claimed suppression of evidence was not of evidence which Brown might have supplied to the People but rather of clues from which the People might have been able to impeach any alibi testimony which Brown might present at the trial. Thus we see notice-of-alibi issues lurking behind the suppression of evidence/consciousness-of-guilt issues we have considered in this case. (See generally, *Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834 [117 Cal.Rptr. 437, 528 P.2d 45]; *Allen* v. *Superior Court* (1976) 18 Cal.3d 520 [134 Cal.Rptr. 774, 557 P.2d 65].)

There is one further aspect of this case which merits mention. Following the initial refusal of Brown to discuss his knowledge of the case with Leach, a warrant check apparently disclosed an outstanding traffic warrant against Brown. The prosecutor, accompanied by several officers, entered the public defender's office and had Brown arrested at a time when he was attempting to discuss the case with defendant's attorney. We have already indicated that equal access to potential witnesses is a goal to be encouraged. Attempts by one side of a controversy to limit such accessibility by the other side is not conduct which brings about respect for our system of justice.

opposing party because the *defendant,* afraid that certain evidence will demonstrate his guilt, has consciously attempted to suppress that evidence. The case of a friend refusing to speak to a representative of the prosecution may be something quite understandable to a juror in his own experience. Even if it were to be viewed by a juror as a basis for giving less weight to the testimony of the witness, it might not necessarily destroy the credibility of that witness. In the latter situation, however, an allegation that the defendant has attempted to suppress adverse evidence, if not entirely refuted, may not only destroy the credibility of the witness but at the same time utterly emasculate whatever doubt the defense has been able to establish on the question of guilt.

When in the present case the jury was instructed and the prosecutor permitted to argue that the refusal of Brown to speak to Leach, if believed, could be considered as a circumstance from which a consciousness of guilt on the part of defendant could be inferred, an impermissible impact may have resulted in the minds of the jurors. This was a close case and it appears reasonably probable that a verdict more favorable to the defendant might have resulted if the error had not occurred. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Accordingly, the judgment must be reversed.

Although we reverse the judgment due to the jury instruction error, we must also address defendant's speedy trial claim, for if meritorious such a violation would entitle defendant to a dismissal of the prosecution rather than simply a reversal of the judgment. Defendant bases his contention that he was denied his constitutional right to a speedy trial on our decision in *Jones* v. *Superior Court* (1970) 3 Cal.3d 734 [91 Cal.Rptr. 578, 478 P.2d 10], and on the fact that while the criminal complaint against him was filed on February 1, 1974, and an arrest warrant was secured on that same date, the warrant was not served on him until September 3, 1974. He argues that he was prejudiced in the preparation of his defense by virtue of this seven-month delay and that the People have failed to provide an adequate justification for the delay. In order to resolve the issue we recite the relevant facts.

After the San Leandro Police Department obtained the warrant for defendant's arrest on February 1, 1974, they entered the fact of its existence into two warrant-tracking computer systems, the police information network, a countywide system, and the Federal Bureau of Investigation's nationwide system. Because defendant's last known address was in the neighboring City of Oakland, San Leandro officers

requested that the Oakland Police Department attempt to serve the warrant at that address. When several Oakland police officers went to the listed address they learned that defendant's father resided there. They informed him that felony warrants had been issued for his son's arrest. In response, the father told the officers that defendant had moved out of the house and had not been seen for a number of weeks. In addition, other comments by the father corroborated information previously gathered by the officers which indicated that defendant might have gone to Chicago. In spite of that possibility, one of the officers present returned to the father's residence at least six times from February through April 1974 in an effort to serve the robbery warrant. On one occasion he knocked on the front door but received no response. The remaining times he saw no lights visible in the house and simply checked the license plate numbers of nearby vehicles in order to ascertain if one was registered to defendant.

Not one of the attempts to serve the warrant at the home of defendant's father was successful. Oakland police officers, nevertheless, retained defendant's photograph and continued to watch for him on the city's streets. Defendant was eventually apprehended on the basis of an unrelated warrant after he was seen riding on a public conveyance. Shortly after defendant was booked a warrant check revealed the existence of the robbery warrant and it was served on September 3, 1974, while defendant was held on the unrelated charge.

In order to assess defendant's speedy trial claim we must evaluate the effect which subsequent decisions of the United States Supreme Court have had on our earlier interpretation of the Sixth Amendment's speedy trial provision in *Jones* v. *Superior Court, supra,* 3 Cal.3d 734. In *Jones* we focused our analysis of the speedy trial issue on the key word "accused" in the relevant portions of both the United States Constitution and the California Constitution, noting that those provisions "provide only that an 'accused' shall enjoy the right to a speedy trial." (*Id.,* at p. 739.) We observed that California courts had long followed the rule that "a person does not become an 'accused' until he has been publicly charged with a crime." (*Id.*) Thus, "[o]ne does not become an 'accused' until the filing of a complaint or other charge." (*People* v. *Jordan* (1955) 45 Cal.2d 697, 708 [290 P.2d 484]; *People* v. *Aguirre* (1960) 181 Cal.App.2d 577, 580 [5 Cal.Rptr. 477].)

It was suggested in *Jones* however that the constitutional speedy trial provisions should not apply to prearrest delays because the exclusive

protection in that context was supplied by the applicable statute of limitations. In addition, we were told that application of the right to a speedy trial in the case of prearrest delay would unduly hamper effective police investigation. We firmly and unequivocally rejected both suggestions, holding that the speedy trial provisions of the United States Constitution[6] and the California Constitution[7] came into play no later than the time at which the complaint against Jones was filed. We proceeded to employ as the test applicable to alleged speedy trial violations a ·weighing of the prejudicial effect of the delay on the defendant against any justification for the delay. (*Id.,* at p. 740.)

Shortly after we rendered our decision in *Jones* the United States Supreme Court addressed a similar speedy trial question in *United States v. Marion* (1971) 404 U.S. 307 [30 L.Ed.2d 468, 92 S.Ct. 455]. The high court focused its attention, as had we, on the use of the word "accused" in the Sixth Amendment. In contrast to the conclusion we reached in *Jones,* however, the language used by the Supreme Court in delineating the scope of protection afforded by the federal charter was more limited than that which we adopted in *Jones*: "[I]t is either a formal indictment or information *or else the actual restraints imposed by arrest and holding to answer a criminal charge* that engage the particular protections of the speedy trial provision of the Sixth Amendment." (*Id.,* at p. 320, italics added.) Insofar as the filing of an indictment or information is concerned the Supreme Court's holding is coextensive with our decision in *Jones.* In the case of a person charged in a complaint who has not yet been apprehended by law enforcement authorities, however, the requirement of arrest and holding to answer before the right to a speedy trial applies, affords less protection than that set forth in *Jones.* It may well be that the Supreme Court's language simply reflects a dissimilarity in labels between our state's prosecutorial procedures and those in other jurisdictions. On the other hand, our perception is that the phrase "holding to answer" is generally accepted to refer in a technical sense, as it does in California, to the decision of a magistrate to bind a defendant over for trial following a preliminary hearing. Thus we conclude that the Supreme Court intended by its use of the foregoing phrase to hold that the filing of a complaint is by itself insufficient to trigger the protection of

---

[6]The Sixth Amendment to the United States Constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . ."

[7]Article I, section 15 of the California Constitution (former art. I, § 13) provides in relevant part: "The defendant in a criminal cause has the right to a speedy public trial, . . ."

the right to a speedy trial under the federal Constitution. To that extent a conflict exists between our interpretation of the Sixth Amendment in *Jones* and the high court's reading of that provision in *Marion,* for as previously indicated, we held in *Jones* that the defendant became an "accused" for Sixth Amendment purposes at the time that the complaint was filed. It is that discrepancy which we next address.

■ It is an elemental principle of our system of federalism that ultimate responsibility for interpretation of the federal Constitution rests with the United States Supreme Court. Thus that court's pronouncement in *Marion* delineating the scope of protection afforded by the Sixth Amendment's guarantee of the right to a speedy trial is binding on this court as well as all other state and federal courts in our nation. At the same time, the Supreme Court's decision in *Marion* did not, and indeed could not, determine the constitutional requirements of the right to a speedy trial guaranteed by the analogous portion of the California Constitution. ■ As we noted in *People* v. *Longwill* (1975) 14 Cal.3d 943, 951, footnote 4 [123 Cal.Rptr. 297, 538 P.2d 753]: "[I]n the area of fundamental civil liberties—which includes not only freedom from unlawful search and seizure but all protections of the California Declaration of Rights—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental civil rights are persuasive authority to be afforded respect-ful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law." We have consistently adhered to the foregoing rule of interpretation and in our nation's system of federalism it is as fundamen-tal a principle of constitutional law as that which rests ultimate authority for interpretation of the federal Constitution in the United States Supreme Court.[8] (See *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 762-768

---

[8]Indeed, during the drafting of the California Constitution of 1879, at which time the guarantee of the right to a speedy trial was first included in our state Constitution, the delegates to the constitutional convention rejected a suggestion that the following language be added to the new Constitution as section 3 of article I: "We recognize the Constitution of the United States of America as the great charter of our liberties, and the paramount law of the land." (Debates and Proceedings, Cal. Const. Convention 1878-1879, p. 179.) Although similar seemingly noncontroversial language had been added to the constitutions of at least 14 other states following (and as a result of) the Civil War, the suggested provision was rejected for two principal reasons. First, many of

[135 Cal.Rptr. 345, 557 P.2d 929]; *People* v. *Disbrow* (1976) 16 Cal.3d 101, 114-115 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Norman* (1975) 14 Cal.3d 929, 939 [123 Cal.Rptr. 109, 538 P.2d 237]; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099]; cf. *People* v. *Olivas* (1976) 17 Cal.3d 236, 246 [131 Cal.Rptr. 55, 551 P.2d 375].)

Our analysis in *Jones* revealed that the established rule in California governing the application of the constitutional right to a speedy trial was that such protection extended to the prearrest stage in cases in which a complaint has been filed against an individual not yet apprehended by law enforcement authorities. Fresh review of the historical basis of the California rule indicates that its development can be traced at least as far back as *Harris* v. *Municipal Court* (1930) 209 Cal. 55, 62 [285 P. 699], fully 40 years before the Supreme Court in *Marion* interpreted the Sixth Amendment as affording a lesser standard of protection than we adhered to in *Jones.* No new justifications have been presented to us which warrant rejection of the rule reaffirmed in *Jones* and the People concede as much, expressly stating in their brief, "The right to a speedy trial encompasses pre-arrest delays in criminal prosecutions." (Citing *Jones* v. *Superior Court, supra,* 3 Cal.3d 734.) Thus our previously quoted language from *People* v. *Longwill, supra,* 14 Cal.3d 943, 951, footnote 4, finds no more apt illustration than in the present case. Upon due

---

the delegates viewed the state constitutions and the Declaration of Independence, rather than the federal Constitution, as the "great charters of our liberties." It was their opinion that the word "charter" meant a written instrument which conveyed or granted rights and privileges. Because they saw the federal Constitution as a grant or delegation of power *from* the individual states *to* the central government and not as an instrument *granting* "liberties" to the people from the central government, the delegates strongly objected to the characterization of the United States Constitution as "the great charter of our liberties."

As a second ground of objection, many delegates were concerned with the implications of the phrase, "and the paramount law of the land." The objection to such language was based on the belief that the phrase failed to note that the United States Constitution was the supreme law of the land solely as to those powers and rights granted to the central government by the states, all others having been reserved to the states or the people by the Tenth Amendment.

As a consequence of the foregoing concerns, article I, section 3 of the Constitution of 1879 was eventually adopted to read: "The State of California is an inseparable part of the American Union, and the Constitution of the United States is the supreme law of the land." (Const. Debates and Proceedings, *supra,* at p. 1510.) Although the changes made by the delegates in the wording of article I, section 3 might seem trivial to one unfamiliar with the debates which accompanied the foregoing revision, amendment of that section was highly significant. By rejecting the originally proposed language, the delegates at the convention emphasized their belief that the California Constitution was and should continue to be a document of independent force and effect particularly in the area of individual liberties.

consideration the United States Supreme Court has apparently conclud-ed that the Sixth Amendment guarantee of the right to a speedy trial does not extend to the prearrest stage when the sole accusation against an individual consists of the filing of a criminal complaint. ■ Neverthe-less, our independent examination of the speedy trial question, *in light of California law* and "the full panoply of rights Californians have come to expect as their due," has led us to conclude that the right to a speedy trial guaranteed by article I, section 15 of the California Constitution applies once a criminal complaint is filed. We continue to adhere to that higher standard of protection against the abuses of pretrial delay.[9]

■ Defendant alleges, as did the defendant in *Jones,* that his constitutional right to a speedy trial was violated by an unjustified delay between the filing of the complaint against him and the time the warrant for his arrest was served. We have concluded that the California Constitu-tion's guarantee of the right to a speedy trial encompasses unjustified delay within such a period. Accordingly, we proceed to the next step of analysis—weighing the prejudicial effect of the delay on defendant against any justification for the delay. (*Jones* v. *Superior Court, supra,* 3 Cal.3d at p. 740.)

The basis of the alleged prejudice in this case stems from defendant's inability to recall his activities or companions on the date of the robbery, January 27, 1974. At the pretrial hearing on the motion to dismiss defendant testified that after the lapse of seven months between the filing of the complaint and service of the warrant he was able to recall only the most general description of his activities on the date in question: (1) The robbery occurred on a Sunday and defendant remembered spending several Sundays—perhaps January 27th—playing cards and visiting with friends in Oakland; (2) The card playing sessions could have lasted until 1 o'clock on the following Monday mornings; (3) The full name of only one of the women at the gatherings and the first name of a man, "Elton,"[10] could be recalled.

---

[9]We note in passing that our citation to the holding of *Marion* in *People* v. *Bradford* (1976) 17 Cal.3d 8, 18 [130 Cal.Rptr. 129, 549 P.2d 1225], reflected no intent on our part to lessen the constitutional standard which we set forth in *Jones* as any conflict between *Marion* and *Jones* was irrelevant to our evaluation of Bradford's claim.

[10]The fact that Brown subsequently testified in defendant's behalf at trial does not necessarily conflict with defendant's pretrial assertion that he could not remember "Elton's" last name. When Brown appeared at the trial shortly before he testified, he apparently did so on his own without a request by the defense.

Despite the fact that defendant chose not to testify at trial, his lack of recall did not leave him without a defense because Elton Brown's testimony supplied him with an alibi. Thus, while the seven-month delay before the warrant was served may have prejudiced defendant, that prejudice was reduced by Brown's testimony.

██ The constitutional right to a speedy trial may be violated by prejudicial delay resulting from intentional efforts to harass or oppress a defendant or simply the neglect of the state or its officers. (*Jones* v. *Superior Court, supra,* 3 Cal.3d at p. 738.) ██ Defendant concedes that there is no evidence of an intentional effort on the part of law enforcement authorities to prejudice him by delaying service of the arrest warrant. He argues, instead, that the police were negligent and acted unreasonably in their efforts to serve the warrant. We disagree. Although negligence in serving an arrest warrant may violate a defendant's right to a speedy trial,[11] our review of the record in the present case convinces us that the police acted reasonably in attempting to serve the warrant on defendant.

First, defendant's assertion that he resided at his parents' home from February 1, 1974, until his arrest and was thus continually available for service of the warrant at a known location during that time, was implicitly contradicted by the statement of his father to the police officers who came to the home and attempted to serve the warrants several days *after* February 1. On that occasion, defendant's father informed the officers that he had moved away and had not been seen for several weeks. Because a conflict in the evidence existed as to where defendant resided during the seven-month period in question, the trial court was not obliged to accept defendant's uncorroborated assertion that he resided with his parents. Even assuming that defendant in fact resided with his parents during the seven-month period, other factors weigh on the side of reasonableness in assessing the efforts to serve the warrant. An officer returned to that residential location at least six times after the initial visit. While he did not knock on the door and attempt to contact the occupants on each occasion, there were no lights visible in the home on all but one attempt. On that occasion no one answered the officer's knock at the door. The same officer checked the license plate number of

---

[11]Before an arrest warrant can be issued, a criminal complaint must be filed as a preliminary step. (Pen. Code, § 813 et seq.) The filing of such a complaint renders the charged individual an "accused" for purposes of article I, section 15 of the California Constitution. (See *ante,* pp. 604-608.) Thus the existence of an arrest warrant means that the individual named in the warrant, whether served or not, enjoys the protection of the right to a speedy trial guaranteed by the California Constitution.

vehicles near the home at other times hoping to learn if one belonged to defendant. Furthermore, shortly after the arrest warrant was issued, its existence was entered into two computer warrant tracking systems, countywide and nationwide in coverage. San Leandro authorities did not simply file the warrant once it was received; they enlisted the aid of a neighboring jurisdiction in order to increase the likelihood that it would be served. Finally, although information was received which led the officers to suspect that defendant had left the state and gone to Chicago, his photograph was distributed to various patrol units. We are satisfied that the foregoing efforts to serve the warrant, in light of the meager information which was known about defendant's location, did not amount to negligence on the part of the state. The People have demonstrated sufficient justification to outweigh whatever prejudice accrued to defendant as a result of the seven-month delay in serving the warrant.[12]

[12]Because we have resolved the conflict between *Jones* and *Marion* through reliance on the independent ground of the California Constitution's speedy trial provision, we need not address another question which would have arisen had we instead chosen to reject the *Jones* approach and adopt the *Marion* interpretation of the right to a speedy trial. In *Jones* we noted that a claimed denial of due process based on prearrest delay is measured by the same test employed to evaluate alleged speedy trial violations—balancing the effect of the delay on the defendant against any justification for the delay. (*Jones* v. *Superior Court, supra,* 3 Cal.3d at p. 741, fn. 1.) To a certain extent that statement created a conflict with the rule set forth in *People* v. *Archerd* (1970) 3 Cal.3d 615 [91 Cal.Rptr. 397, 477 P.2d 421], for in that case we observed that prearrest delay resulting in prejudice to a defendant "must be purposeful, oppressive, and even 'smack of deliberate obstruction on the part of the government,' before relief will be granted." (*Id.,* at p. 640, citing *Miller* v. *Rodriguez* (10th Cir. 1967) 373 F.2d 26, 28; *Foley* v. *United States* (8th Cir. 1961) 290 F.2d 562, 566.) The United States Supreme Court subsequently adopted a similar viewpoint in *Marion,* noting the concession of the Government in its brief "that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the preindictment delay in [the] case caused substantial prejudice to [the defendants'] rights to a fair trial and that the delay was an *intentional* device to gain tactical advantage over the accused." (*United States* v. *Marion, supra,* 404 U.S. at p. 324 [30 L.Ed.2d at p. 480], italics added.) The lesson to be drawn from *Marion* and *Archerd,* therefore, is that while the same test is used to measure alleged violations of due process or the right to a speedy trial based on prejudicial pretrial delay, a court presented with such a due process claim will not engage in the *Jones* balancing test until it is established that the delay was *intentionally* caused by the state.

Since *Jones, Archerd* and *Marion* were decided the question of whether preindictment delay caused by the *negligence* of the state can violate due process has been considered in *Penney* v. *Superior Court* (1972) 28 Cal.App.3d 941 [105 Cal.Rptr. 162]. Noting our statement in *Jones* that the same balancing test is used to evaluate speedy trial claims and due process claims, the court read *Jones, Archerd* and *Marion* together and concluded that negligence on the part of the state resulting in prejudice to a defendant can, if not outweighed by sufficient justification for the delay, violate due process. (*Penney* at pp. 951-952.) Needless to say, the *Penney* interpretation of the due process issue conflicts with the requirement of intentional delay set forth in *Archerd* and *Marion*. At the same time, the facts in the *Penney* case demonstrate that negligent delay may often result in as

The judgment is reversed.

Tobriner, Acting C. J., Mosk, J., and Sullivan, J.,* concurred.

Richardson, J., concurred in the judgment.

**CLARK, J.**—Again, unless its text, history or function supports a broader construction, a state constitutional provision affords no greater right than the parallel provision of the federal Constitution. (*People* v. *Maher* (1976) 17 Cal.3d 196, 204 [130 Cal.Rptr. 508, 550 P.2d 1044] (Clark, J., dis.); see *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 533-537 [134 Cal.Rptr. 774, 557 P.2d 65] (Clark, J., dis.); *People* v. *Ramey* (1976) 16 Cal.3d 263, 277-281 [127 Cal.Rptr. 629, 545 P.2d 1333] (Clark, J., dis.); *People* v. *Disbrow* (1976) 16 Cal.3d 101, 117, 118-121 [127 Cal.Rptr. 360, 545 P.2d 272] (Richardson, J., dis.); *United Farm Workers of America* v. *Superior Court* (1975) 14 Cal.3d 902, 914-915 [122 Cal.Rptr. 877, 537 P.2d 1237] (Richardson, J., conc.); *People* v. *Norman* (1975) 14 Cal.3d 929, 940-942 [123 Cal.Rptr. 109, 538 P.2d 237] (Clark, J., dis); *Gee* v. *Brown* (1975) 14 Cal.3d 571, 576-577 [122 Cal.Rptr. 231, 536 P.2d 1017] (Clark, J., dis.); *People* v. *Brisendine* (1975) 13 Cal.3d 528, 553-558 [119 Cal.Rptr. 315, 531 P.2d 1099] (Burke, J., dis.).)

The texts of the speedy trial provisions of the California and federal Constitutions are virtually identical. The Sixth Amendment to the United States Constitution provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, . . ." Article I, section 15, of the California Constitution provides in pertinent part: "The defendant in a criminal cause has the right to a speedy public trial, . . ." Indeed, this court has consistently held that the

much prejudice to a defendant as delay intentionally caused.

Our resolution of the conflict between *Jones* and *Marion* by reliance on the California Constitution's guarantee of the right to a speedy trial indicates that we need not reach the issue of whether negligently caused pretrial delay can violate the due process clause of the California Constitution, and we reserve consideration of that issue until some future time.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

California speedy trial provision "reflects the letter and spirit" of the federal provision. (*Jones* v. *Superior Court* (1970) 3 Cal.3d 734, 738 [91 Cal.Rptr. 578, 478 P.2d 10]; *People* v. *Wilson* (1963) 60 Cal.2d 139, 144, fn. 2 [32 Cal.Rptr. 44, 383 P.2d 452]; *Harris* v. *Municipal Court* (1930) 209 Cal. 55, 60 [285 P. 699].) (*Jones* and *Harris* are, ironically, the cases upon which the majority principally rely. (*Ante,* pp. 604-608.)) Therefore, I find no reason to conclude that the California speedy trial provision sets a "higher standard of protection against the causes of pretrial delay." (*Ante,* p. 608.)

On July 6, 1977, the opinion was modified to read as printed above.