Filed 11/22/13  P. v. Wood CA5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F064697 |
| v. | (Super. Ct. No. BF137139A) |
| JAMES DYLAN WOOD, | **O P I N I O N** |
| Defendant and Appellant. | |

### THE COURT\*

APPEAL from a judgment of the Superior Court of Kern County. Kenneth C. Twisselman II, Judge.

Mark McBride for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Angelo S. Edralin, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Poochigian, Acting P.J., Detjen, J., and Peña, J.

A jury convicted appellant, James Dylan Wood, of willful infliction of injury on a spouse (Pen. Code,[1] § 273.5, subd. (a)) and assault with a deadly weapon (§ 245, subd. (a)(1)), and found true allegations that appellant personally inflicted great bodily injury (§ 12022.7, subd. (e)) in committing the count 1 offense and that he had suffered a prior conviction of violating section 273.5, subdivision (a) within the previous seven years (§ 273.5, subd. (e)(1)). The court imposed a prison term of five years, consisting of two years on the count 1 offense and three years on the accompanying enhancement. On count 2, the court imposed, and stayed pursuant to section 654, a term of two years.

On appeal, appellant's sole contention is the court erred in instructing the jury in accordance with CALJIC No. 2.06 that jurors could infer consciousness of guilt from attempts to suppress evidence. We affirm.

## FACTS

### The Instant Offenses

Blaire Wood and appellant have been married since August 2010.[2] They have one child together, A., who was almost eight months old at the time of trial. Blaire did not want to testify at appellant's trial.

On May 16, 2011 (May 16), Blaire, who was living separately from appellant at the time, took A., then a little less than one month old, to visit appellant at his residence, a small one-room "back house" located near a separate larger house. Appellant's friend, Michael Travis, was also there. After staying a few hours, Blaire, who did not want to stay the night, decided to leave. This made appellant angry, and she and appellant argued.

---

[1]   All statutory references are to the Penal Code unless otherwise indicated.

[2]   Except as otherwise indicated, our factual summary of the instant offenses is taken from Ms. Wood's testimony. For the sake of brevity and clarity, and not out of disrespect, we refer to Ms. Wood by her first name.

2

As appellant and Blaire spoke, Blaire put A. in a stroller, outside the door of the house. Then, remembering that appellant had her "bank card," Blaire walked back inside the house and asked appellant, who was lying on a mattress, for the card. Appellant refused, Blaire became angry and the two argued. Shortly thereafter, Blaire "stormed out of the room," out of appellant's field of view, but two or three seconds later, "went back in to say something else." At that point, while she was "standing outside the room but in the doorway," a "plastic, white, Malibu rum bottle," at least half full, came "flying at [her]" and struck her a "split second" after she entered the doorway. The "wind ... knocked out of [her]," Blaire "dropped to [her] knees" and "then ... ended up [lying] on the ground because [she] was in a lot of pain."

Appellant tried to pick her up, and asked her if she needed an ambulance, but she was unable to speak or breathe. After he "made sure" that a person from the main house, Monica Gomez, was there with her, appellant, along with Travis, left the house and drove off. Gomez called 911.

Blaire was taken to a hospital, and she remained hospitalized for three days. The physician who examined Blaire in the hospital emergency room testified Blaire had suffered a "grade two splenic rupture," also known as a "fractured spleen."

Bakersfield Police Officer Ryan Wimberly testified to the following: On May 16, while responding to a report of domestic violence, he made contact with Blaire outside a structure he described as a shed. Blaire, who was in great pain, told the officer appellant had thrown a half-gallon rum bottle at her. The officer looked "in the trash cans," "in the yard," "in the bushes," and "in the shed" for the bottle but did not find it.

Michael Travis testified to the following: Appellant is his best friend. He was "present" in May 2011 when "an incident happened involving [appellant and Blaire]." The two were arguing loudly and at one point, Blaire walked out the door. Appellant said to Blaire, "[t]ake your shit with you," and threw the bottle "[h]ard," "[l]ike a baseball

3

pitch." Travis, who "assumed [Blaire] had already left," was not looking at the door, but he "heard Blaire" and "that's when [he] saw that it hit her." She was "pretty much in front of the doorway." Appellant tried to help Blaire to her feet, "asking her [if she] was okay and stuff like that." At that point, someone from the main house "came out" and called 911, and appellant and Travis, who were "in shock," left and went to Travis's house.

When asked on cross-examination, "What happened to [the bottle]" and "Did you take it with you," Travis answered, to both questions, "I don't remember." When asked if he "ever [saw appellant] with the liquor bottle after Blaire was hit with it," Travis answered, "yes."

Appellant testified to the following: One day in May 2011, he was at his residence along with Michael Travis when Blaire brought A. over for a visit. Appellant thought Blaire would stay the night and when she said she was going to leave, he became angry and upset. The two argued, and appellant was "throwing a fit." Blaire walked out the door and disappeared from appellant's view. Blaire had previously brought a bottle of rum over, and the half-full bottle was on the floor near appellant, who was seated on a mattress on the floor. Appellant reached for the bottle. "At the moment [he] touched the bottle," he was "facing away from the doorway." Then, thinking if "you don't want to be with me take all your stuff with you," appellant grabbed the bottle and, still sitting, "[i]n a single motion" as he was turning back to face the door, threw the bottle hard, intending to throw it out the door. At that point, his "eyes caught something." He was "already in motion" and he "couldn't just stop." As he let go of the bottle, he saw Blaire, and saw the bottle strike her.

Appellant left because he thought he would be arrested if he stayed, even though "it was an accident." He turned himself in to law enforcement two days later.

The following exchange occurred on cross-examination:

4

"Q. What happened to the rum bottle? Do you know?

"A. It was disposed of.

"Q. By who?

"A. I can't remember.

"Q. By you?

"A. I can't remember.

"Q. But you know somebody took it?

"A. Yeah."

### Evidence of Uncharged Acts of Domestic Violence

#### May 21, 2007 Incident

Gina Sousa testified to the following: She dated appellant for approximately one year in 2006 and 2007. On May 21, 2007, during an argument, appellant jumped up on the hood of Sousa's car and "smashed" the windshield by kicking it. A short time later at Sousa's house, appellant and Sousa "got into another verbal argument," during which appellant "tackled" Sousa from behind, got on top of her, and held her arms down.

#### September 21, 2010 Incident

Bakersfield Police Officer John Buoni testified to the following: On September 21, 2010, responding to a report of "a subject reporting his wife attempt[ed] to stab him with a pen," he made contact with Blaire. Blaire told the officer that appellant took her iPhone and dunked it in a tub of water, and that when she tried to wrestle the phone from his hands, he grabbed her by the hair, pulled her to the ground, and kicked her in the head "several" times. Buoni observed that Blaire had a bump and an abrasion on her forehead, her right eye was swollen, she had a small cut on her face below her eye, and she had small abrasions on her right knee and right ankle.

#### November 1, 2010 Incident

Bakersfield Police Officer Francisco Esguerra, Jr., testified that at 12:44 a.m. on

5

November 1, 2010, he was dispatched to an address in Bakersfield where he made contact with Blaire, who told him the following: She had been arguing with appellant, her husband, at the couple's residence, "at which time he began punching holes in the wall and saying he would assault her." Blaire left and went to the home of a family member. While she was there, appellant telephoned her "numerous" times and sent her "numerous" text messages in which he threatened to assault her.

Esguerra further testified to the following: He saw some of the text messages. One of them said Blaire "would get the beating of a lifetime." Another said, "I will beat your fucking stomach in if you don't let me come get you." Blaire stated she was four months' pregnant and was afraid appellant would assault her and cause her to have a miscarriage.

*September 27, 2011 Incident*

Bakersfield Police Officer Verion Coleman testified that on September 28, 2011, in responding to a report of domestic violence, he made contact with Blaire who told him the following: The previous day she and appellant had argued. He wanted to leave with the couple's child and when Blaire "would not allow" him to do so, he told her that he would "lay her out" if she did not allow him to take the child. At one point during the argument, appellant "grabbed [Blaire] by her neck and held it for about two to three seconds."

Coleman further testified that he spoke with appellant who admitted grabbing Blaire by the neck, and said Blaire "was trying to provoke him by saying ... he was a bad dad and that she was going to divorce him."

**DISCUSSION**

The court instructed the jury, using the language of CALJIC No. 2.06, with slight modifications, as follows: "If you find that the defendant attempted to suppress evidence against himself in any manner, such as by destroying evidence or by concealing evidence,

6

this attempt may be considered by you as a circumstance tending to show a consciousness of guilt. However, this conduct is not sufficient by itself to prove guilt. And its weight and significance, if any, are for you to decide."

Appellant contends the evidence adduced at trial did not support the inference he suppressed evidence, and therefore the court erred prejudicially in instructing the jury pursuant to CALJIC No. 2.06, as set forth above.

"'It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference.'" (*People v. Hart* (1999) 20 Cal.4th 546, 620, accord, *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case"].) "Whether or not any given set of facts may constitute suppression or attempted suppression of evidence from which a trier of fact can infer a consciousness of guilt on the part of a defendant is a question of law. Thus in order for a jury to be instructed that it can infer a consciousness of guilt from suppression of adverse evidence by a defendant, there must be some evidence in the record which, if believed by the jury, will sufficiently support the suggested inference." (*People v. Hannon* (1977) 19 Cal.3d 588, 597; accord, *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 [CALJIC No. 2.06 properly given where "jury could reasonably infer from [the] evidence that defendant attempted to suppress evidence"].)

Here, the evidence showed the following: The victim was struck by a rum bottle thrown by appellant; when police searched the scene the bottle was nowhere to be found; appellant testified he knew somebody "disposed of" the bottle but he could not "remember" who; and Travis, appellant's friend, testified he (Travis) saw appellant with the bottle after appellant threw it.

7

Appellant discounts Travis's testimony on this last point on the grounds that (1) it was brief—it came in a one-word answer to a question from the prosecutor—and (2) Travis also testified he was "in shock" upon realizing Blaire had been struck by the bottle and therefore, appellant suggests, Travis was an unreliable observer. These factors notwithstanding, the jury could reasonably credit this testimony and the other evidence summarized above, and reasonably infer from this evidence that appellant suppressed evidence, viz., the rum bottle. Therefore, the court did not err in giving the jury the challenged instruction.

While we find that there was no error, we also conclude that even if the trial court had erred in giving the instruction, we could not reverse on this ground. A judgment may only be reversed on appeal for instructional error, such as that complained of here, if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Hannon*, *supra*, 19 Cal.3d at p. 603 [applying *Watson* standard to erroneous instruction of the jury under CALJIC No. 2.06].) Our review of the record convinces us that it is not reasonably probable that had the trial court withheld the disputed instruction, the jury would have reached a result more favorable to appellant.

First, CALJIC No. 2.06 tends to benefit a defendant. As our Supreme Court has stated, referring to CALJIC No. 2.06 and other consciousness-of-guilt instructions: "'[E]ach of [these] instructions made clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory.'" (*People v. Boyette* (2002) 29 Cal.4th 381, 438.)

8

Second, the evidence against appellant was strong.  As indicated above, there was no dispute the victim was struck by a one-half gallon, half-full liquor bottle thrown by appellant with great force.  Appellant claimed he intended to merely throw the bottle out the door and did not intend to hit the victim with it.  However, the jury heard evidence of multiple acts of domestic violence committed by appellant, providing strong support for the prosecution position that he threw the bottle with the intent to injure the victim.  (See Evid. Code, § 1109 [permitting the admission of a defendant's other acts of domestic violence for the purpose of showing a propensity to commit such crimes, subject to certain limitations].)

Third, the jury also heard evidence that appellant fled the scene soon after the crime.  And, as the jury was properly instructed, such evidence of flight, though not sufficient in itself to establish guilt, could be considered by the jury on the question of whether appellant was guilty or not guilty.  (See *People v. Vu* (2006) 143 Cal.App.4th 1009, 1030 ["evidence of flight immediately after the commission of a crime is relevant to show consciousness of guilt"].)  Thus, the jury heard and was properly instructed on other evidence of appellant's conduct that could give rise to an inference of consciousness of guilt.  This reduced the significance of (1) the evidence appellant suppressed the rum bottle and (2) CALJIC 2.06.

On this record, it is not reasonably probable that a verdict more favorable to appellant would have resulted if the court had not instructed the jury with CALJIC No. 2.06.  Therefore, if giving the instruction was error, such error was harmless.

## DISPOSITION

The judgment is affirmed.

9