Filed 7/15/13  P. v. Rhinehart CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C067952 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F06857) |
| v. | |
| LAMONT LEE RHINEHART, | |
| Defendant and Appellant. | |

Defendant Lamont Lee Rhinehart and Avery Polk dated for many years and had a child together.  In July 2007 Avery was found stabbed to death in her home.  An information charged defendant with murder, and alleged the personal use of a dangerous weapon and the commission of a murder while engaged in the commission of a rape.  A jury found defendant guilty of murder and found the allegations true.

Sentenced to life in prison without the possibility of parole, defendant appeals, contending (1) the court erred in admitting evidence of uncharged acts against Avery and against defendant's estranged wife K.R., admitting Avery's statements made prior to the murder, and in excluding evidence of K.R.'s drug sales conviction; (2) the court abused

its discretion in denying defendant's mistrial motions; (3) instructional error; (4) sentencing error; (5) cumulative error; and (6) the court erred in ordering defendant to pay attorney fees. We shall strike the order imposing attorney fees. In all other respects we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Avery and defendant quarreled over the attentions of another man. After Avery's sisters found her body on the floor of her home, defendant was charged with her murder.

An amended information charged defendant with murder, and alleged he personally used a dangerous and deadly weapon and committed the murder while engaged in the commission of a rape. The information further alleged defendant had a previous felony conviction. (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1), 190.2, subd. (a)(17)(c), 667, subd. (a).)[1]

A jury trial followed. The following evidence was introduced at trial.

**Prior to the Murder**

Defendant and Avery began dating in 1998 and had a daughter together in 2001. Defendant and Avery's relationship had its ups and downs from 2005 through 2007. Avery moved into a condominium in 2007 with her daughter; defendant did not reside with them.

On June 28, 2007, when Avery was at her sister Stephanie's house, her sister overheard Avery speaking on the phone with defendant. According to Stephanie, Avery was angry because defendant had answered Avery's cell phone when Steven Mitchell called her. Avery told Stephanie she wanted defendant to start picking up her daughter from Stephanie's house to avoid defendant's going to Avery's house.

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

The following evening, Stephanie spent the night at Avery's house. In the early morning hours defendant rang Avery's doorbell. When Stephanie threatened to call the police, defendant left.

Over the next several days defendant repeatedly called Avery's cell phone. Phone records revealed defendant called Avery 33 times on June 30, 2007.

Avery met Steven Mitchell at a motorcycle event in 2005. After seeing each other from time to time in 2005, Mitchell lost contact with Avery and did not reconnect until about a week before July 2, 2007. When Mitchell crashed his motorcycle on June 29, 2007, he canceled a trip to Los Angeles and made arrangements to meet Avery on July 2.

That evening, Avery cleaned her house in anticipation of Mitchell's visit. Stephanie picked up Avery's daughter and took her home to spend the night. Avery called Stephanie around 11:00 p.m. and told her that Mitchell was on his way. Avery was angry with defendant because he kept calling her.

Mitchell arrived at Avery's condominium complex that evening. He called Avery's cell phone and she buzzed him in through the front security gate. Avery told Mitchell she would wait for him outside. After he drove in, Mitchell did not see Avery so he called her phone repeatedly.

Avery failed to respond and the calls went to her voicemail. After waiting outside for about 30 minutes, Mitchell left. He was irritated that Avery failed to show up.

On the evening in question at around 10:54, a neighbor of Avery, Lydia Soto, heard the sound of someone being chased. Soto looked outside her window and saw an African American man "rushing" another person into Avery's condo. Soto heard a woman's voice say, " 'Don't beat me before I call 911.' " After the man slammed Avery's front door shut, Soto heard screaming coming from the condo.

That night, Henry Waters and Carlos Becknell were in a condominium near Avery's unit. Between 11:00 and 11:30 p.m. the two men left the condo and got into

3

Waters' car. Waters and Becknell saw defendant walking past the condominium's garages as they left the complex.

**After the Murder**

Avery's sisters, Stephanie and Angela, did not hear from her the following day. Defendant phoned Stephanie that day, but she thought he was drunk and could not understand what he was saying.

On July 4, 2007, defendant called Stephanie. Defendant told her he had been to Avery's condominium and that no one answered the door. Avery's sisters went to Avery's condominium to check on her. The security door and the interior door were unlocked. Inside, Stephanie and Angela found Avery's body on the floor.

After the police secured the scene, defendant arrived. Defendant rushed toward Avery's condo and officers knocked him down to prevent him from entering. Angela kicked defendant while he was on the ground. Defendant smelled of alcohol, and the officers detained him.

**Autopsy and Evidence from the Scene**

An autopsy revealed Avery suffered several blunt force injuries to her face. Her left jaw was fractured and her arms were bruised. Avery suffered four stab wounds: two lethal and two nonlethal. One lethal wound stretched from Avery's back to her heart, hitting a lung and her liver. The other lethal wound began at Avery's hip and entered her abdomen. Two nonlethal wounds went to Avery's right breast. The autopsy could not ascertain the time of Avery's death.

Vaginal swabs taken from Avery's body revealed sperm that matched defendant's DNA profile. Sperm matching defendant's DNA profile was also found on Avery's underwear.

Fingernail scrapings from defendant's right hand revealed a mixture of DNA from a major and a minor contributor. The major contributor's sample DNA profile was consistent with defendant's; Avery was a potential minor contributor. The probability

4

that a randomly selected African American was a minor contributor to the mixture was one in one million.

Blood found on Avery's kitchen counter matched Avery's DNA, and blood found in the kitchen sink matched defendant's DNA. Defendant's fingerprints were found on a trash can located in the kitchen.

**Defendant's Injuries**

Defendant worked as an electrician. On July 3, 2007, defendant went to work and told his supervisor that he had injured his hand when he dropped some pipes on it. Defendant's hand was bruised and swollen. Defendant did not want to go to the doctor, so his supervisor performed basic first aid on his hand. According to defendant's supervisor, the injury was inconsistent with the work defendant had been engaged in.

**Uncharged Acts of Violence**

In April 2004 Stephanie and Avery were preparing to leave Avery's apartment for a motorcycle event. Defendant arrived and Avery asked him to take care of their daughter for the weekend. Defendant became angry, grabbed Avery, threw her to the ground, and punched her in the face. Stephanie called 911, and defendant threatened to return with a gun. The 911 call was played for the jury, and photos of Avery's injuries were introduced into evidence.

K.R. and defendant were married and had a child together. In September 1999 K.R. and defendant had separated but met to attend either a parenting class or a court date. When defendant picked up K.R., he took her to his house instead of going to their appointment. Inside the house, defendant forced K.R. to have sex against her will. K.R. reported the incident to the police.

Two months later defendant went to K.R.'s house and forced her into his car. He slammed K.R.'s head against the dashboard and drove her to his house; he dragged her inside. Defendant had left their daughter alone in a crib in the house. After K.R.'s mother arrived, K.R. left.

Following this incident, K.R. obtained a restraining order against defendant. In November 1999, as K.R. was leaving work for the day, she saw defendant. Defendant chased her, but K.R. managed to elude him.

In August 2001 K.R. was with defendant in his home when they got into an argument. Defendant bashed K.R.'s head into a wall. Defendant dragged K.R. into her daughter's bedroom, punched her in the face six or seven times, and strangled her until she struggled to breathe. K.R. identified photos showing her injuries from the attack.

**Prior Convictions**

The parties stipulated that defendant had been convicted of misdemeanor domestic violence for the November 8, 1999, incident against K.R. and felony domestic violence for the incident against K.R. on August 2, 2001. (§ 273.5.) Defendant was also convicted of a felony for the incident involving Avery on April 20, 2004. (§ 273.5.)

**Defense Case**

Defendant presented eyewitness identification testimony by psychologist Geoffrey Loftus, an expert in memory and perception. Professor Loftus testified that memory changes over time. In addition, people can develop memories that are not accurate.

Defendant's mother testified that defendant always wore his hair very short or was bald. Defendant never wore dreadlocks or cornrows. Defendant lived with her and was usually home in the evenings.

An expert in forensic blood pattern analysis described the blood patterns found in the kitchen and on a wall outside the kitchen in Avery's condo. In the expert's opinion, the blood evidence on the wall and in the kitchen area was not cast-off blood.

**Verdict and Sentence**

The jury found defendant guilty of first degree murder and found the enhancement allegations true. The trial court sentenced defendant to prison for life without the possibility of parole, and to an additional consecutive year in prison for the weapon violation. Defendant filed a timely notice of appeal.

6

## Evidentiary Issues

### Uncharged Acts

Defendant argues the trial court erroneously admitted the uncharged conduct against Avery and K.R. The admission of this evidence, defendant contends, deprived him of due process and a fair trial.

#### *Background*

During in limine motions, the prosecution requested rulings on a variety of prior acts by defendant: (1) on April 30, 2004, defendant beat Avery in her sister's presence; (2) in 2004 Avery's cousin spent the night at Avery's house and awoke to the sound of someone slapping Avery; (3) on July 30, 2001, defendant slammed K.R.'s head against the wall and on August 2, 2001, punched her in the head and face; (4) on November 24, 1999, defendant chased K.R. as she left work; (5) on November 8, 1999, defendant forced K.R. into his car and hit her in the face, after which K.R. obtained a restraining order against defendant; and (6) on September 7, 1999, defendant raped K.R.

Defense counsel objected to the admission of these prior uncharged acts on both constitutional grounds and under Evidence Code section 352. The trial court ruled all of the incidents were admissible.[2]

#### *Discussion*

##### <u>Evidence Code Sections 1108 and 1109</u>

Defendant argues Evidence Code sections 1108 and 1109 violate due process and equal protection. However, courts have previously rejected this argument regarding both

---

[2] The court stated the 2004 slapping incident was admissible if the prosecution provided an adequate foundation. Avery's cousin testified about the incident, but the court struck her testimony because the prosecution failed to provide a sufficient foundation. We discuss this testimony, *post*.

sections. (*People v. Falsetta* (1999) 21 Cal.4th 903, 919-922, rejecting challenge to section 1108; *People v. Fitch* (1997) 55 Cal.App.4th 172, 184, rejecting challenge to section 1108; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1310-1314, rejecting challenge to section 1109.)

**<u>Evidence Code Section 352</u>**

Under Evidence Code section 1108, evidence of prior sexual offenses is admissible for any relevant purpose but is subject to Evidence Code section 352. (*People v. Britt* (2002) 104 Cal.App.4th 500, 505.) Under section 352, a trial court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate an undue consumption of time or create a substantial danger of undue prejudice by confusing the issues or misleading the jury.

In evaluating evidence under Evidence Code section 352, the trial court considers the similarity of the uncharged act to the charged offense, whether the source of the evidence is independent of the charged offense, and the amount of time that elapsed between the uncharged and charged offenses. To determine the prejudicial effect, the court examines whether the uncharged act resulted in a criminal conviction, the relative strength of the evidence of the act, and whether the uncharged act is more inflammatory than the evidence of the charged offense. (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.) We review the court's decision for an abuse of discretion. (*People v. Branch* (2001) 91 Cal.App.4th 274, 282.)

Defendant argues the introduction of these uncharged acts portrayed him as an abuser of women and a rapist to bolster a circumstantial case. According to defendant: "The narrow identification issue and related narrow sex offense/felony murder issues . . . in this case should have been resolved on the circumstantial evidence, not unfair, prejudicial, and unduly expansive theories of asserted propensities."

Defendant objects to the admission of the uncharged rape of K.R. in 1999, the 911 call from Avery's sister after the 2004 incident in which defendant punched and

8

threatened Avery, the photos of Avery's injuries, and the incident in which defendant chased her in 1999, arguing the trial court abused its discretion in failing to find the prejudicial impact of the evidence outweighed its probative value.

In considering whether to admit prior acts of domestic violence, the court must consider whether the prior acts are more inflammatory than the charged conduct; the possibility the jury might confuse the prior acts with the charged acts; the closeness in time of the prior acts; and whether the defendant has already been convicted of the prior acts. (*People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

Here, the evidence of the uncharged rape was not more inflammatory than the charged murder and rape of Avery. Nor is there a possibility the jury might confuse the uncharged 1999 rape with the charged crimes. K.R. testified at trial about the incident.

However, the 1999 rape was years earlier than the 2007 murder, and although K.R. reported the rape, defendant was not convicted. We note that the court instructed the jury: "If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of rape." We presume the jury was capable of understanding and following the court's instructions. (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1502.)

On balance, we cannot find the court abused its discretion in admitting the 1999 rape of K.R. Defendant's prior conduct was probative in that it established defendant became violent with women with whom he was involved. The prior conduct was less egregious, although years earlier. Finally, the trial court cautioned the jury not to base defendant's guilt for the charged crime on his conduct in 1999.

Defendant also argues, "In light of other available evidence, down to prior convictions, admitting viscerally disturbing photos and a 911 call amounted to needless and unduly prejudicial overkill that extinguished any chance [defendant] had at a fair

9

trial." In addition, defendant contends the evidence of the supposed stalking of K.R. in 1999 was "needless and peculiarly prejudicial."

We disagree. These other acts were not more inflammatory than the charged conduct, nor was there a possibility that the jury might confuse the prior acts with the charged act. The incident involving the 911 call and photos of Avery's injuries took place in 2004, and defendant was charged with and convicted of those acts. The incident involving K.R. was more remote in time, and defendant was not charged and convicted. However, we cannot find the trial court abused its discretion in admitting the incident, which was probative of defendant's actions toward women he dated.

**K.R.'s Drug Sales Conviction**

Defendant also challenges the trial court's refusal to allow him to impeach K.R. with evidence of her 1995 drug sales conviction. Defendant complains that the court admitted an unconfirmed, unprosecuted 1999 rape allegation and 1999 and 2000 domestic violence convictions, but excluded K.R.'s drug felony conviction, which occurred only four years before her report of rape in 1999.

*Background*

Defense counsel sought to admit K.R.'s prior convictions for impeachment purposes. K.R.'s prior convictions consisted of (1) a 1995 conviction for possession of cocaine for sale, (2) a 2000 misdemeanor check fraud conviction, (3) a 2006 misdemeanor possession of a controlled substance conviction, and (4) a 2007 misdemeanor theft conviction. (Health & Saf. Code, §§ 11351.5, 11377; Pen. Code, §§ 475, subd. (c), 484, subd. (a).)

The trial court allowed impeachment with the check fraud conviction and the misdemeanor theft conviction. However, the trial court excluded the possession of a controlled substance conviction because it was not a crime of moral turpitude.

The court also found inadmissible the 1995 possession of cocaine for sale, finding it too remote in time. The court reasoned: "[O]n [K.R.], I'll allow the [Penal Code

10

section] 484 misdemeanor conviction and the [Penal Code section] 475 misdemeanor conviction. Those are clear, straight-up crimes that involve truth-telling, and obviously they are admissible, but they are comparatively minor conduct, and it doesn't, in the Court's mind, refresh an 11351.5 felony conviction [under the Health and Safety Code], which is in this moral turpitude category, and so I will foreclose that."

### *Discussion*

A witness's conviction of a crime may be used to impeach that witness. However, the trial court may exercise its discretion under Evidence Code section 352 to exclude a conviction when its probative value is exceeded by the risk of undue prejudice. (*People v. Feaster* (2002) 102 Cal.App.4th 1084, 1093-1094.) In making this determination, the court considers whether the conviction reflects on honesty and the remoteness of the conviction. We review the court's decision to exclude or admit a conviction for an abuse of discretion. (*People v. Clair* (1992) 2 Cal.4th 629, 654; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 352.)

Here, the trial court allowed K.R.'s impeachment with a 2000 check fraud conviction and 2007 theft conviction, but did not admit the 1995 conviction for possession of cocaine for sale or the 2006 conviction for possession of a controlled substance. The convictions admitted cast doubt on K.R.'s credibility and were of fairly recent vintage. The 1995 drug conviction was considerably older and would have merely reinforced the already tarnished image of K.R.'s ability to tell the truth. We conclude there was no abuse of discretion in the court's decision not to admit the drug conviction.

**Avery's Statements**

Defendant argues the court also erred in admitting Avery's statements as evidence of her state of mind. These statements, defendant contends, were "unreliable and largely hearsay evidence from biased witnesses on which the defense had no opportunity to cross-examine the key declarant."

11

*Background*

The prosecution sought to admit several statements Avery made before her death. Defense counsel objected and the trial court allowed counsel to "federalize" the objections. The court found most of the statements admissible under Evidence Code section 1250 as evidence of Avery's state of mind.

Subsequently, the prosecution introduced several of Avery's statements at trial. Avery's sister Angela testified that on June 28, 2007, prior to the murder, Avery told her she was angry with defendant for answering her phone. Avery said she was "ready to just leave it alone," meaning her relationship with defendant.

Angela also testified that later, when she and Avery were in the car, defendant called Avery. Defendant offered Avery money, which she turned down. Avery told defendant she " 'didn't want to be bothered' " by him. Avery told Angela she was going to shop for cleaning supplies to clean her house for company she was expecting that evening. Later that evening, Avery called her sister and told her defendant was "continuously" calling her phone. To Angela, Avery appeared nervous, but she was also excited about the company she expected that evening.

Another of Avery's sisters, Stephanie, also testified that on June 28, 2007, Avery was upset with defendant for answering her phone. Stephanie overheard Avery on the phone with defendant, cursing him and asking why he answered the phone when Mitchell called her. Avery asked defendant, " 'Why are you obsessing about Steve [Mitchell]?' " Avery told defendant she did not want him to bother her anymore, and she would no longer be present when they exchanged custody of their daughter. She told Stephanie that she had put defendant's belongings in one of her cars so he could retrieve them.

Stephanie spent the night at Avery's house on June 29, 2007. Stephanie testified that defendant knocked on Avery's door at 4:40 the next morning. Avery asked Stephanie to tell him she was asleep.

12

Stephanie testified that defendant called Avery on June 30. Avery told defendant she would not attend a barbecue with him. She also told Stephanie she was not going to fall for defendant's tricks and that she was done with him. On July 1 Stephanie heard Avery tell defendant to stop calling her. On Monday, July 2, Avery told her sister that Mitchell was on his way to her home. Avery said defendant "won't stop calling."

The court instructed the jury regarding Avery's statements: "From this witness and from other witnesses, you are going to hear a lot of statements that [Avery] made, and these statements can be considered for very special purposes under the law. A statement such as 'I don't want to see this person anymore,' you can consider that as a direct statement she made about her mind, her state of mind, and you can consider that, whether or not that is true, and how it fits in with all of the other evidence you will receive. [¶] Other statements she makes are not about the emotions she is feeling or her state of mind at the moment, but they are about facts that she relates from which you might draw inferences about her state of mind. For example, 'He called me multiple times,' or 'I am going to have a visitor this evening.' Those statements cannot be considered for the truth of the matter asserted; that is, whether or not she is going to have a visitor that night or not, or whether or not he even called many times. [¶] But you can consider that, given the whole, it gives you some inference, some circumstantial evidence as to what her state of mind is. So you can't consider it for the truth of the matter asserted that she was really going to have a visitor that night, but you can consider it as to what her state of mind might be if she stated that in terms of wanting other guests or not, for example, okay? [¶] Do you understand that admonition?"

### Discussion

Defendant argues the evidence should have been excluded under Evidence Code section 352, since it was coming from "angry family members and a declarant whom the defense had no opportunity to confront[;] the evidence here was indeed misleading and

13

unfair." The prosecution exacerbated the unfairness, defendant contends, by arguing this proved defendant was the jealous nighttime attacker.

The court found Avery's statements admissible under Evidence Code section 1250. Section 1250 provides an exception to the hearsay rule for statements of a declarant's state of mind. Such statements are admissible when offered to prove the declarant's state of mind when it is itself in issue or the evidence is offered to prove or explain acts or conduct of the declarant. (*People v. Crew* (2003) 31 Cal.4th 822, 840.)

Defendant contends Avery's statements were "recent generic anecdotes from [*sic*] weakly reflected no more than a 'transitory' [citation] state of mind in an up and down relationship that included ongoing shared child custody issues." We disagree.

During closing arguments, defense counsel argued Avery and defendant engaged in consensual sex before another person murdered Avery. Avery's statements that she did not want defendant to call her anymore and that she was done with him revealed a state of mind contrary to the portrait of a compliant Avery that defense counsel sought to paint. As such, these statements were highly probative. The prejudicial impact of the statements was minimal. Therefore, the trial court did not err in admitting them.

### Motions for a Mistrial

Defendant argues the court erred in denying mistrial motions he made after Denise Sydnor testified that she heard defendant beat Avery in 2004 and K.R. testified defendant beat her while she was pregnant. According to defendant, given this evidence "[j]urors could not help developing an urge to punish appellant," resulting in incurable prejudice.

**Background**

Defendant's first mistrial motion centered on Denise Sydnor's testimony. Sydnor, Avery's cousin, testified that in 2004 she went to Avery's house to get ready for her prom. Sydnor and her sister fell asleep at the house after Avery and defendant went to the movies. Sydnor woke up to the sound of Avery's screaming and crying, and slapping and banging noises.

14

The prosecution asked Sydnor if she heard Avery tell defendant to stop. Sydnor said she did not remember.

The trial court, out of the jury's presence, held an Evidence Code section 402 hearing. During the hearing, Sydnor testified she heard a man grunt but did not hear him say anything. However, Sydnor said she knew it was defendant attacking Avery because she knew what he sounded like.

At the end of the hearing, defense counsel moved for a mistrial. The trial court found no foundation for Sydnor's testimony since she based her identification of defendant on grunting sounds alone. The court denied the mistrial motion and instead struck Sydnor's testimony about the incident and admonished the jury not to consider the testimony.

Defendant also moved for a mistrial based on K.R.'s testimony about defendant's abuse during her pregnancy. K.R. testified she married defendant about a year after they met and had a child several years later. The prosecution asked K.R.: "Sometime after [your daughter] was born, did the defendant begin abusing you or did it happen before? [¶] A. Um, before. [¶] Q. And when did it become physical abuse? [¶] A. What do you mean physical? [¶] Q. Where he put his hands-on [*sic*] you and struck you in any way? [¶] A. When I was pregnant. [¶] Q. After you had [your daughter], did you separate from the defendant? [¶] A. I never went back home. I went to my mother's house. After I left the hospital, I went home to my mother's."

If the court denied the mistrial motion, defense counsel requested that the trial court strike K.R.'s testimony and admonish the jury accordingly. The court held an Evidence Code section 402 hearing to determine the validity of K.R.'s testimony. K.R. testified that defendant slapped her several times during her pregnancy. Following the hearing, the prosecutor stated she was not seeking to admit evidence that defendant slapped K.R. when she was pregnant.

15

The trial court denied the mistrial motion: "the answer given that I summarized at the outset of this 402 hearing with regard to 'What do you mean physical? When he put . . . his hands-on [*sic*] me and that series of questions.' Although, it was possibly an inquiry as to timing, the dominant inference is it actually related some incident of physical conduct and that would be consistent with what she said in the 402 hearing. [¶] There was, I think, the District Attorney stumbled into that area, but this is not a situation where she was just blurting it out. She was responding to [an] actual line of inquiry. [¶] The People aren't seeking it at this point under [Evidence Code section] 1109. Obviously, they did not seek it earlier, and given the context of the whole, I would not allow the People to have it anyway. It's comparatively minor. [¶] So it's inappropriate. It was adduced inappropriately, and it is before the jury now in an inappropriate manner, and I will admonish them and strike it. [¶] This obviously doesn't rise to the level of mistrial either individually or cumulatively."

The court admonished the jury: "In the early part of the examination of this last witness, Ms. Rhinehart, there was a very brief line of questioning by Ms. Dozier inquiring whether or not there had been physical contact made by the defendant against Ms. Rhinehart and where the hands had been put on her by the defendant, and one reasonable and possibly even dominant inference in that very brief line of questioning was that he had touched her in some way during the time that she was pregnant with their child. [¶] I'm going to strike that sequence of questioning and direct that you are to totally disregard those questions and answers in that area. [¶] Do you understand the admonition? Is everyone all right with that? Everyone can comply now? You can't consider it for any purpose, can't talk about it in the deliberation room, all right with that? All right."

Later in the trial, the court reconsidered the admonition. After reading the transcript of K.R.'s testimony the court determined: "the admonition was incorrect or imprecise in that there wasn't testimony that would lead to a dominant inference that

16

[defendant] touched Mrs. Rhinehart when she was pregnant. It was direct that he had touched her when she was pregnant, and that it was physically abusive in nature."

The trial court offered to further clarify the admonition, but defense counsel declined the offer. Defense counsel stated: "I would appreciate you are [*sic*] not ringing the bell twice."

**Discussion**

The court must grant a motion for a mistrial if a prejudicial error takes place at trial that is not curable by admonition. A witness's voluntary statement may amount to such incurable prejudice. We review the trial court's ruling on a mistrial motion for an abuse of discretion. (*People v. Alexander* (2010) 49 Cal.4th 846, 915; *People v. Williams* (1997) 16 Cal.4th 153, 211; *People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.)

Defendant argues Sydnor's and K.R.'s testimonies were "needless references on visceral points [that] were incurably prejudicial." However, the jury heard Sydnor's testimony about defendant's slapping Avery after Spidell testified that she had seen defendant severely beat Avery. Similarly, K.R.'s testimony that defendant slapped her while she was pregnant followed her testimony that defendant had raped and beaten her over the course of their relationship. The testimony defendant describes as "visceral" paled in comparison to similar testimony admitted at trial.

The court struck the testimony and admonished the jury not to consider it. We presume the jury followed the court's instructions not to consider the improper evidence. (*People v. Burgener* (2003) 29 Cal.4th 833, 870.) We find no abuse of discretion in the court's denial of defendant's mistrial motions.

**Instructional Error**

Defendant faults the court's instructions, or lack of instructions, on third party culpability, felony murder special circumstance, and the burden of proof. In each instance, defendant contends the court erred.

**Third Party Culpability**

Defendant contends the court erred in refusing to instruct the jury on third party culpability. According to defendant, the court's refusal to allow the defense to argue that Mitchell killed Avery compounded the error.

*Background*

During the discussion of jury instructions, defense counsel requested an instruction on third party culpability. The defense also wanted to argue that Mitchell, not defendant, murdered Avery.

The trial court declined to give the instruction. In addition, the court ruled defense counsel could not argue Mitchell murdered Avery: "They are credible points that in most instances may support that it was someone else, for example, with the knife that it could have been a double edged knife and my client didn't have a double edged knife. [¶] You may argue that if you want; therefore, it is probably someone else. You can do that. You just can't say, therefore, it was Mr. Mitchell."

*Discussion*

The court must instruct, even in the absence of a request, on the general principles of law relevant to the issues raised by the evidence. These general principles refer to those principles closely and openly connected with the facts before the court and which are necessary to the jury's understanding of the case. (*People v. Sedeno* (1974) 10 Cal.3d 703, 715.) Before giving the instruction, the court must find legally sufficient evidence in the record to support the finding or inference that the instruction permits. (*People v. Hannon* (1977) 19 Cal.3d 588, 597 (*Hannon*).)

An instruction on third party culpability must be given only when direct or circumstantial evidence links another party to the crime and raises a reasonable doubt as to the defendant's guilt. However, evidence of mere motive or opportunity to commit the crime in another person, without more, is not sufficient to raise a reasonable doubt as to the defendant's guilt. Instead, there must be direct or circumstantial evidence linking the

18

third party to the crime. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1325; *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).)

At trial, the evidence established that on the night of Avery's murder, Mitchell arrived at her condominium complex. He spoke with Avery by cell phone and she buzzed him in. After Mitchell drove into the complex, he did not see Avery, so he called her 10 to 15 times. When Avery did not answer, Mitchell's calls went to voicemail. Mitchell waited for Avery for half an hour but left, irritated, when she failed to show up.

Defendant argues the evidence that Mitchell, not defendant, committed the murder "was easily sufficient to raise a reasonable doubt of [defendant's] guilt." The circumstantial evidence included Mitchell's presence at the scene, opportunity, motive, and matching a physical description and Mitchell's injuries. According to defendant, "These lines of circumstantial proof were similar to those offered against [defendant]." In addition, defendant contends, the court's error in foreclosing defense counsel from arguing the evidence could point to Mitchell as the assailant seriously compounded the instructional error.

Here, the evidence revealed Mitchell had the opportunity to kill Avery and a possible motive for killing Avery, his anger that she failed to show up for their meeting. However, evidence of mere motive or opportunity for Mitchell to kill Avery does not raise a reasonable doubt about defendant's guilt. Defendant must also provide direct or circumstantial evidence linking Mitchell to Avery's killing. (*Hall, supra,* 41 Cal.3d at p. 833.) We find defendant's efforts to provide such evidence unconvincing.

According to defendant, since Avery might have been killed by a double-edged weapon, Mitchell's status as a biker links him to the crime. During closing argument, defense counsel noted the connection between motorcycle groups and "weapons of double bladed variety."

The evidence showed Avery's stab wounds might have been inflicted by a double-edged weapon, but the injuries also might have been caused by a kitchen knife.

19

Moreover, defendant failed to connect motorcycle enthusiasts with double-edged weapons. This failure renders his argument speculation, not circumstantial evidence.

Defendant also reiterates his argument that Mitchell lied about being injured during a motorcycle accident to disguise the fact that the injuries were incurred during the murder. Defense counsel argued Mitchell testified he injured his left wrist, but an investigator testified the injury was to the right wrist. According to defense counsel, Mitchell lied because the left side of Avery's face was battered.

We agree with the trial court's assessment of this evidence. The court noted: "you certainly can't reach an inference that because the gentleman has an injury on one side of his body as opposed to the other . . . that that is direct evidence or circumstantial evidence that connects him as the person who is actually a perpetrator of the crime."

None of this evidence provided direct or circumstantial evidence that Mitchell killed Avery. Instead, defendant provides speculation as to the provenance of the weapon and a possible motive. Evidence of mere motive or opportunity to commit the crime, without more, is not sufficient to raise a reasonable doubt about defendant's guilt. (*Hall*, *supra*, 41 Cal.3d at p. 833.)

Defendant also contends the court erred in preventing defense counsel from asserting during argument Mitchell's culpability for Avery's death. According to defendant, the "defense here was completely denied a chance to present a significant defense theory to this jury," but the prosecution was able to raise and dismiss the possibility of Mitchell's possible culpability in closing, leaving the defense no opportunity to respond.

However, defense counsel did discuss Mitchell in closing argument. Defense counsel argued that a witness, Lydia Soto, saw a dark skinned African American male. Defense counsel referred to a photo of defendant, noting defendant was lighter in skin color than victim Avery. Defense counsel continued: "I am showing you a copy of . . . Exhibit 189, and what you see highlighted in orange shows that Mr. Steven Mitchell was

20

still in the area at 23:47 and 46 seconds.  [¶]  As you'll recall, there was testimony that Ms. Spidell introduced [Avery] to Mr. Mitchell, and at I think a motorcycle barbecue type outing.  [¶]  There was also testimony that Mr. Mitchell on a Friday had been on a motorcycle run, I guess, with some friends.  There is no evidence as to whether it was a club or anything.  When another motorcycle, as I recall the testimony, came into him damaging him, the reason I bring this up is when he testified before you, obviously, he was a dark skinned African American male.  And when forensic investigator Woo took photographs of his injuries, they were on the right side of his body.  [¶]  And that was Detective Woo's testimony which was not the same as Mr. Mitchell's testimony which was that he injured his left side.  [¶]  The weight to give that is totally up to you."

The prosecution responded:  "I'm going to identify the elephant in the room.  Mr. Mitchell.  He's the real killer.  There is absolutely no evidence to support that.  That you were asked to look at the phone records that Mr. Mitchell was in the area as indicated by the phone records at 11:47 p.m. on July the 2nd.  [¶]  If you look at those phone records, there is [*sic*] repeated calls to Ms. Avery Polk's phone starting at about 11:15, 11:20.  There is [*sic*] at least ten calls that go straight to voice mail which corroborates Mr. Mitchell's testimony that as he was waiting at the pool area, Avery didn't show up, and so he started calling her.  [¶]  If he's the real killer, the elephant in the room, why on earth is he phoning Avery over and over again for a good 30 minutes."

Defense counsel, during closing argument, raised the specter of Mitchell as Avery's murderer.  The prosecution's comments responded to defense counsel's allegations that Mitchell better fit the profile of Avery's assailant.  Such give and take during closing argument did not deprive defendant of his right to a fair trial or due process.

**Felony-Murder Special Circumstance**

Defendant contends the trial court failed to fully instruct on the felony-murder special-circumstance allegation.  Felony-murder special circumstance requires that the

felony cannot be incidental to the murder. Defendant argues the CALCRIM instruction given "does not appear to properly convey the non incidental requirement; instead, it conveys misleading technical intent requirements and excludes the core objective non-incidental element."

### *Background*

The court instructed with CALCRIM No. 730: "The defendant is charged with the special circumstance of murder committed while engaged in the commission of rape in violation of Penal Code section 190.2(a)(17).

"To prove that this special circumstance is true, the People must prove that:

"1. The defendant committed rape;

"2. The defendant intended to commit rape;

"3. The defendant did an act that caused the death of another person;

"and

"4. The act causing the death and the rape were part of one continuous transaction.

"To decide whether the defendant committed rape, please refer to the separate instructions that I will give you on that crime. You must apply that instruction when you decide whether the People have proved this special circumstance.

"The defendant must have intended to commit the felony of rape before or at the time of the act causing the death.

"In addition, in order for the special circumstance to be true, the People must prove that the defendant intended to commit rape independent of the killing. If you find that the defendant only intended to commit murder and the commission of rape was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."

22

*Discussion*

Defendant argues "concurrent intent to kill and commit another felony is not *automatically* enough, as suggested by the second-to-last sentence in the instruction, if the felony is not independent of the killing [citation]; and, further, that the *conjunctive* 'and' in the final sentence dispenses with the *objective* non-incidental felony element, which is the crux of the special circumstance, as a separate element. Taken together, these two sentences convey a bare independent intent element, which applies to any felony-murder, instead of the objective non-incidental element that is the crux of the special circumstance."

Despite defendant's effort to find confusion and perplexity, the instruction given plainly and simply informed the jury that it must find defendant intended to commit the underlying rape separately from forming the intent to kill in order to find the felony-murder special circumstance applicable.

To prove a felony-murder special-circumstance allegation, the prosecution must show defendant possessed an independent purpose for committing the felony, not merely an intent incidental to an intended murder. If the felony is merely incidental to achieving the murder, then the special circumstance is not present. However, if the defendant had an independent felonious purpose, such as robbery or rape, and commits the murder to advance that independent purpose, the special circumstance is present. (*People v. Horning* (2004) 34 Cal.4th 871, 908.) The instruction given adequately described the conditions necessary for the felony-murder special circumstance to apply.

**Burden of Proof**

Defendant argues CALCRIM Nos. 852 and 1191, which the court read to the jury, conflict with the burden of proof instruction in CALCRIM No. 224, denying him due process. The instructions, defendant contends, fail to distinguish the lesser standard of proof to establish the prior conduct from the greater standard of proof applicable to the

23

ultimate propensity and guilt inference, and suggest the prior conduct is sufficient to support a conviction if the jury finds the conduct true beyond a reasonable doubt.

### *Background*

During jury instruction discussions, the trial court found it had a sua sponte duty to instruct with CALCRIM Nos. 852 and 1191. Defense counsel stated it was requesting the instructions.

CALCRIM No. 852 states: "The People presented evidence that the defendant committed domestic violence that was not charged in this case. [¶] . . . [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit the charged crimes. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the charged crimes and allegations. The People must still prove the charges and each allegation of every charge beyond a reasonable doubt."

The court, pursuant to CALCRIM No. 1191, instructed: "The People presented evidence that the defendant committed the crime of rape against [K.R.] that was not charged in this case. This crime is defined for you in these instructions.

24

"You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

"If the People have not met this burden of proof, you must disregard this evidence entirely.

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the crime of rape, as alleged/charged here. If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of rape. The People must still prove the charges and allegations beyond a reasonable doubt."

In addition, the court instructed on the reasonable doubt standard pursuant to CALCRIM No. 220: "Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."

Finally, the court instructed with CALCRIM No. 224, which states, in part: "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt."

25

*Discussion*

The court instructed the jury that it could find defendant guilty of the charged crimes only if the prosecution proved the charges beyond a reasonable doubt. We presume jurors are capable of both understanding and applying the court's instructions on applying the various standards of proof. (*People v. Zandrino* (2002) 100 Cal.App.4th 74, 84, fn. 6.)

The Supreme Court in *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*) entertained a similar challenge to the predecessor of CALCRIM No. 1191, CALJIC No. 2.50.01. After considering the instruction, the court determined no reasonable juror would believe a conviction could be based solely on the uncharged offense. The instruction stated that proof of the uncharged offenses was not sufficient alone to prove the defendant's guilt of the charged crimes beyond a reasonable doubt. No reasonable juror would conclude that the lower standard of proof applicable to the uncharged offense would apply to the proof of the charged offenses. (*Reliford*, at pp. 1012-1016.)

As in *Reliford*, the instructions given in the present case informed the jury that proof of the uncharged offenses alone could not be used to prove defendant's guilt of the charged crimes beyond a reasonable doubt. In light of the instructions given, no reasonable juror would assume the lower standard of proof applied to the uncharged offenses sufficed to meet the burden of proof on the charged offenses.

**Consciousness of Guilt Instruction**

Defendant challenges the sufficiency of the evidence to support the court's instructing pursuant to CALCRIM No. 362, a consciousness of guilt instruction. The court based the instruction on defendant's false statement; defense counsel objected to the instruction.

*Background*

The prosecution requested CALCRIM No. 362 based on defendant's statements to his supervisor that he hurt his hand working on pipes. Defense counsel objected, arguing,

26

"I don't think the testimony supports that. [¶] Mr. Henning in particular when asked to testify explained his training had absolutely no way of -- my opinion, of making a determination as to the degree of the injury suffered." Defense counsel termed Henning's testimony "weak."

The trial court overruled the objection, stating: "The issue, of course, is for the jury to decide whether or not those were false statements to Mr. Henning. [¶] The instructions are drafted so that any reasonable alternative is instructed for. One reasonable alternative is that Mr. Henning's assessment was accurate and the statement was false. [¶] I think the alternative theory is probably valid as well because this is an oral expression like an explanation of shock, or feigned crying that probably qualifies as well. But the Henning incident is clear, more on point, justifies the instruction."

The court subsequently instructed: "If the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

### *Discussion*

A trial court properly instructs on consciousness of guilt where there is some evidence in the record that, if believed by the jury, would sufficiently support the inference suggested in the instructions. (*People v. Bowman* (2011) 202 Cal.App.4th 353, 366.) Such an instruction is proper if there is some evidence in the record to support the inference. (*Hannon*, *supra*, 19 Cal.3d at p. 597.)

Consciousness of guilt may be inferred from a defendant's false or misleading statements made to arresting officers or others for the purpose of misleading or allaying suspicion. (*People v. Fritz* (2007) 153 Cal.App.4th 949, 959.) Defendant argues it was

27

improper to give the instruction, which penalized a statement "that is just as likely to have been in good faith as to have been deliberately false or misleading."

At trial, defendant's supervisor, Michael Henning, testified defendant came to work on July 3, 2007. Defendant told him he had injured his hand by dropping pipe on it. Henning, who had experience with construction injuries, looked at the injury, and in his opinion, the injury was not caused by a pipe dropping on it. According to Henning, defendant's injury was not "conducive [*sic*] to the task he was performing."

Henning acknowledged it was possible for defendant to have injured his hand at work. However, Henning reiterated that, in his opinion, defendant's injury did not correspond to the type of work he was performing.

Defendant argues the court should not have instructed jurors that defendant's statement to Henning could be considered a false statement "because the statement was just not manifestly false or manifestly internally inconsistent." We disagree.

Avery sustained severe injuries to her face consistent with someone's having punched her. Third-party testimony placed defendant at Avery's condominium complex late in the evening of July 2, 2007. This evidence sufficiently supported the inference that defendant lied about his injuries to Henning to conceal the fact that he had injured his hand striking Avery the previous evening. We find the trial court's decision to give CALCRIM No. 362 supported by the record.

## Sentence

Defendant challenges his sentence, arguing the court applied the felony-murder special circumstance unconstitutionally because it failed to narrow the class of persons subject to it as compared to other murder defendants. Defendant asserts this claim solely to preserve it for federal habeas corpus review. However, defendant acknowledges that

28

the California Supreme Court has rejected such claims. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195.)[3]

## Attorney Fees

Finally, defendant argues the trial court erred in ordering him to pay $3,175 in attorney fees. According to defendant, there was no evidence demonstrating his present ability to pay, and the trial court failed to hold the statutorily required hearing to determine his ability to pay.

**Background**

The probation report recommended that "[i]f there are reimbursable costs to the County in the disposition of this case for appointed counsel, presentence investigation, probation supervision or incarceration, it is recommended the defendant be ordered to report to the Department of Revenue Recovery for a financial evaluation and recommendation of ability to pay said costs."

At sentencing, the court ordered defendant to pay "for the cost of the preparation of the probation report and for counsel services." The fees imposed amounted to $3,175 for appointed counsel. Defense counsel did not object.

**Discussion**

The People contend defendant forfeited this claim by failing to object. However, in *People v. Viray* (2005) 134 Cal.App.4th 1186, the court held forfeiture cannot be based on the failure of defense counsel to challenge an order concerning his or her own fees. The court reasoned: "It seems obvious to us that when a defendant's attorney stands before the court asking for an order taking money from the client and giving it to the attorney's employer, the representation is burdened with a patent conflict of interest and cannot be relied upon to vicariously attribute counsel's omissions to the client. In such a

---

[3] Since we find no error by the trial court, we need not address defendant's claim of cumulative error.

29

situation the attorney cannot be viewed, and indeed should not be permitted to act, as the client's representative. Counsel can hardly be relied upon to contest an order when a successful contest will directly harm the interests of the person or entity who hired him and to whom he presumptively looks for future employment." (*Id.* at pp. 1215-1216.) Accordingly, defendant has not forfeited his challenge to the attorney fees order.

The People concede, if the issue is not forfeited, that the case should be remanded to the trial court to determine defendant's present ability to pay. We agree.

Section 987.8, subdivision (b) provides, in pertinent part: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, *after notice and a hearing*, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings." (Italics added.)

Here, the trial court did not conduct a hearing to determine defendant's present ability to pay the fees. However, defendant argues a remand to determine his ability to pay would be "no more than an ' "idle gesture" ' [citation]" because he lacks the ability to pay any fees imposed by the court. The People argue that a remand is appropriate given defendant's prior employment as an electrician and the statutory obligation imposed upon him to pay if he has the ability to do so. We respect the spirit of the People's argument but doubt that it would be a sensible use of public funds, in light of the presumption that a defendant sentenced to state prison lacks a "reasonably discernible future financial ability to reimburse the costs of his or her defense" absent a finding of "unusual circumstances." (§ 987.8, subd. (g)(2)(B); see *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1537.) Whatever defendant's earning capacity might have been before his incarceration, it is doubtful that he will be working as an electrician in the near

30

future given his sentence of life without the possibility of parole. The record does not suggest a basis for a finding of unusual circumstance. Fiscal prudence and judicial economy impel us to strike the order imposing attorney fees.

## DISPOSITION

The judgment is modified to strike the order assessing attorney fees in the amount of $3,175, or any amount. As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment reflecting this modification and to forward a certified copy thereof to the Department of Corrections and Rehabilitation.

RAYE            , P. J.

We concur:

BUTZ            , J.

MAURO            , J.

31