[No. A097378. First Dist., Div. Three. Apr. 30, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
ALLIE JAMES BELL, Defendant and Appellant.

---

**COUNSEL**

L. Richard Braucher, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, and Catherine A. McBrien, Deputy Attorney General, for Plaintiff and Respondent.

---

**OPINION**

**CORRIGAN, J.**—Defendant Allie James Bell was charged with the attempted second degree robbery and murder of Levar Craft and the attempted murder of Angela Dossman. A jury convicted Bell of the crimes against Craft, but acquitted him of the attempted murder of Dossman. The jury also found that the murder was committed during the course of the attempted robbery, and that Bell had personally used a gun to kill Craft. The trial court committed prejudicial error by giving CALJIC No. 2.28 regarding the late disclosure of statements given by alibi witnesses. Accordingly, we reverse.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

Levar Craft was shot on February 6, 1999, about 9:30 p.m., in Solano County. Angela Dossman told the police that a man shot Craft while trying to rob him. Dossman said she knew the assailant as "Jimmy," describing him as "dark-skinned, very skinny and tall." Although she did not know the assailant's last name, he was a friend of her brother-in-law and he had been at her home a few weeks earlier. Dossman viewed three photographic lineups, none

---

[1] In light of our determination, we do not address Bell's other claims of error.

of which contained Bell's photograph. When Dossman was shown a fourth photo array she immediately identified him. Dossman was "very certain" that Bell was the assailant.

On the night of the shooting, David Welch heard several gunshots. He ran out of his condominium and saw a man pointing what looked like a .45-caliber gun[2] towards a turnaround roadway. Welch also saw Craft's body lying on the ground near an island in the turnaround. Welch saw the armed man in profile for about 10 to 15 seconds. The man then turned, apparently saw Welch, and ran away. As the man was running, Welch saw his full face for more than two seconds. Welch told the police that if he saw the man again, he could identify him, and described him as dark-skinned, about six feet tall, with a "wiry" build. About 17 months after the shooting, he viewed a six-person physical lineup, and identified Bell as the man he had seen on February 6th. At the lineup, Welch said that he was "about 80 percent" certain of his identification. He identified Bell at trial.

More than a year after the shooting, Bell was arrested in San Bernardino. He had no identification at the time. After giving two false names and birth dates, he provided his true name. When he heard a police dispatcher say he was wanted for murder, however, he told the arresting officer that Bell was not his name, but the name of his cousin. On the booking form, Bell signed his brother's name.

Bell's defense was based upon discrediting the eyewitness testimony of Dossman and Welch. He also presented an alibi. Without objection, during her direct and cross-examination, Dossman admitted she had suffered three misdemeanor prostitution convictions, and one misdemeanor conviction for using someone else's name. Dossman's former boyfriend, Kelvin Lamar Chapman, testified that he had known Dossman for at least 15 years, and that she lied frequently. On the day after the shooting, he had gone to Dossman's house to help her move because she was afraid the shooter would find her there. Chapman claimed Dossman told him that she did not know who the shooter was, and never mentioned the name "Jimmy."[3] Chapman admitted he had an extensive criminal history, including one conviction for murder, two for selling rock cocaine, and one for assault with a firearm. Bell called Dr. Robert Shomer, an eyewitness identification expert. He testified that an identification made under the circumstances experienced by Welch would be "highly unreliable," and that an identification made by a person in Dossman's situation would not have a "high rate of reliability."

---

[2] It was undisputed that the murder weapon was a .32-caliber firearm.

[3] Dossman denied she told Chapman she did not know the shooter. She claimed she told Chapman the shooter was Jimmy.

To support his alibi Bell called his cousin Bobby Jones, and two other witnesses, all of whom lived in San Bernardino. The witnesses testified Bell was in San Bernardino by January 1999 and he stayed there until his arrest in March of 2000. Thus, according to Jones, Bell could not have committed the crimes in February of 1999. On cross-examination, the prosecutor emphasized inconsistencies between the witnesses' trial testimony and statements they had given to both defense and prosecution investigators. She brought out that the witnesses did not know where Bell was on the actual day of the shooting, and had not given their alibi information to law enforcement agents at an early stage in the proceedings.

## DISCUSSION

### Trial Court's Giving CALJIC No. 2.28 Was Prejudicial Error

#### A. Relevant Facts

On June 15th, the second day of trial, the prosecutor complained that the defense had failed to comply with the discovery statute (Penal Code, § 1054 et.seq.[4]) by not disclosing the alibi witnesses' statements in a timely fashion.[5] Although the defense investigator had spoken to the witnesses during the first week in May of 2000, the prosecutor did not receive their statements until June 3, 2000, 10 days before the scheduled trial date. The court indicated it would allow the alibi witnesses to testify, but would consider the prosecutor's request for an instruction on late discovery.

During a later conference regarding jury instructions, the prosecutor asked the court to instruct on the late disclosure using CALJIC No. 2.28. When the court asked whether the witnesses' statements had been timely disclosed, defense counsel replied, "[I]t's all in your perception. As soon as I got the reports from my investigator, I turned them over. I didn't have them. He had the information before that because I think it was sometime in the first part of May or mid-May or whenever, but I didn't get reports until about the day

---

[4] All further unspecified statutory references are to the Penal Code.

[5] Under section 1054.3, "[t]he defendant and his or her attorney shall disclose to the prosecuting attorney: [¶] (a) The names and addresses of persons, other than the defendant, he or she intends to call as witnesses at trial, together with any relevant written or recorded statements of those persons, or reports of the statements of those persons . . . ." The disclosure under section 1054.3 "shall be made at least 30 days prior to the trial, unless good cause is shown why a disclosure should be denied, restricted, or deferred. If the material and information becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately, unless good cause is shown why a disclosure should be denied, restricted, or deferred." (§ 1054.7.)

before that I turned them over to [the prosecutor]." Defense counsel conceded he could have told the prosecutor the names of the witnesses but he could not tell the prosecutor anything else until he got a report from his investigator. Defense counsel also asserted the People were not harmed. The prosecutor replied that had she gotten the information on time, she would have had 30 days to investigate and get information "so we could corroborate their statement[s]." The court found that defense counsel had not attempted to gain a tactical advantage, but, over Bell's objection, ruled that an instruction on late disclosure was appropriate. It noted that the defense had gotten the statements from the witnesses in sufficient time to send them to the prosecutor at least 30 days before the trial date that had been set many months earlier.

The court gave CALJIC No. 2.28, as follows: "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of truth, save court time and avoid any surprise which may arise during the course of the trial. Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence. [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the Defendant failed to timely disclose the following evidence: [¶] 1. The statement of witness Bobby Jones. [¶] 2. The statement of witness Patrice Lucious. [¶] 3. The statement of witness Teresa Williams. [¶] Although the Defendant's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial. [¶] The weight and significance of any delayed disclosure are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence."

## B. *Analysis*

■ Section 1054.5, subdivision (b), provides that, in order to enforce the provisions of the discovery statute, the court may, inter alia, direct immediate disclosure of information; conduct contempt proceedings; delay or prohibit witness testimony or the presentation of evidence; grant a continuance; and/or "advise the jury of any failure or refusal to disclose and of an untimely disclosure." The statute does not elaborate on what, specifically, the jury may or should be told.

We observe at the outset that the instruction was, at least partially, inaccurate. The court informed the jury that "the Defendant" failed to make a

timely disclosure. There is nothing in the record to show that Bell did anything of the kind. The failure here belonged to counsel and his investigator. It was misleading to suggest that "the defendant" bore any responsibility for the failed compliance.

Moreover, although the jurors were told "[t]he weight and significance of any delayed disclosure are matters for your consideration," the instruction provides no guidance on how this failure might legitimately affect their deliberations. While they were told that tardy disclosure might deprive an opponent of the chance to subpoena witnesses or marshal evidence in rebuttal, there was no evidence that such an eventuality transpired here. The prosecutor pointed out the obvious fact that if she had gotten the information earlier she would have had more time to investigate it. She did not, however, assert that the time she had was insufficient, nor did she ask for a continuance to permit additional inquiry.

"[B]efore a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." (*People v. Hannon* (1977) 19 Cal.3d 588, 597 [138 Cal.Rptr. 885, 564 P.2d 1203].) The jurors here were told that they were not to "consider or discuss facts as to which there is no evidence." (CALJIC No. 1.03.) But, they were simply left to speculate, in the absence of any information, that the People were put at an actual disadvantage because of the late discovery. Further, if there were no diminution of the People's right to subpoena witnesses or present rebuttal, it is unclear how the jurors were to evaluate the weight of the potentially affected testimony. Certainly, in the absence of any practical impact on the factfinding process, the only sphere of jury responsibility here, the jurors were not free to somehow fashion a punishment to be imposed on Bell because his lawyer did not play by the rules.

The instruction implied that the jurors should "do something" but they were given no idea what that something should be. Their alternatives were severely limited. They could disbelieve, discount, or look askance at the defense witnesses. But it is not clear why, or to what extent, they should do so in the absence of evidence that the prosecution was unfairly prevented from showing that the witnesses were unreliable. Just as the failure of disclosure was not Bell's fault, there is absolutely no indication that the witnesses were responsible for the delayed discovery. As noted, the prosecution did properly attack the witnesses' credibility in conventional ways by

pointing out that their testimony was inconsistent and that they did not come forward earlier or contact the authorities to report that the wrong man had been charged.

■ In an appropriate case, jurors may conclude that a defendant has tried to present a contrived defense, but only if they find he or she was somehow culpable for the discovery shortcoming. The situation is analogous to attempts to fabricate evidence. A jury may be told that an attempt at fabrication *by the defendant* may show a consciousness of guilt. (See *People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) However, such an instruction is improper if the only evidence is that a third party made such an attempt, unless the evidence would also support a conclusion the defendant authorized the third party's action. (See *People v. Perez* (1959) 169 Cal.App.2d 473, 477–478 [337 P.2d 539] [evidence that a third party tried to suppress testimony inadmissible unless there is also evidence that the third party acted with defendant's approval].) In addition, Bell did not testify, so the jurors could not take his failure, had there been any, into account in evaluating his own credibility.

Significantly, other instructions[6] that address a defendant's consciousness of guilt "ma[k]e clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, *while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt*, and allowing the jury to determine the weight and significance assigned to such behavior. The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory." (*People v. Jackson, supra*, 13 Cal.4th at p. 1224, italics added.) No such clarification was included here. As a result, the jurors may have concluded they were free to find Bell guilty merely because he failed to comply with the discovery statute.

■ It is axiomatic that a trial is a search for the truth. (*People v. Zack* (1986) 184 Cal.App.3d 409, 415 [229 Cal.Rptr. 317].) Procedural rules, including those of discovery, are designed to ensure that the search is fair, reasonably pursued, and based on reliable information. The rationale behind California's discovery statute is that neither side should be allowed to engage in, or be subjected to, a trial by ambush. (*In re Littlefield* (1993) 5 Cal.4th 122, 131 [19 Cal.Rptr.2d 248, 851 P.2d 42].) As noted, the court has a variety of remedies available to penalize those who fail to comply with its rulings

---

[6] See, e.g., CALJIC Nos. 2.03 (Consciousness of Guilt—Falsehood), 2.04 (Efforts by Defendant to Fabricate Evidence), 2.05 (Efforts Other Than By Defendant To Fabricate Evidence), 2.06 (Efforts to Suppress Evidence); 2.52 (Flight After Crime).

and the requirements of the statute. (*Mendibles v. Superior Court* (1984) 162 Cal.App.3d 1191, 1198 [208 Cal.Rptr. 841].) Inviting the jury to speculate, or to punish a defendant for the malfeasance of someone else, however, are not among the weapons in its arsenal.

The instruction given did invite the jurors to speculate; it told them to evaluate the weight and significance of a discovery violation without any guidance on how to do so; and it falsely informed them that Bell was responsible for the violation. It did not warn them that the violation, standing alone, was insufficient to support a guilty verdict.

The prosecution's case was not overwhelming. There was no physical evidence tying Bell to the murder scene. He gave no statement. There was no evidence of any connection between Bell and Craft before the killing. The People's case consisted essentially of two eyewitnesses. One had a fairly brief opportunity to see the assailant. The credibility of the other was impeached by the admission of evidence that she was a frequent liar and had suffered prior misdemeanor convictions.

The presentation of his alibi was a critical part of Bell's case. The instruction unfairly undermined the testimony of the alibi witnesses. The prosecutor capitalized on the jury instruction at closing argument to discredit Bell's alibi defense, telling the jury: "You are going to get an instruction that those [alibi] witnesses were not even provided to the People in a timely fashion. We were responsible for revealing our witnesses 30 days before trial for obvious reasons. So everybody can know and be on a level playing field, everything is all fair. And you will get an instruction that those names weren't turned over to the People within 30 days of trial. [¶] So when you are thinking about was that [alibi defense testimony] all drummed up, factor in that [CALJIC No. 2.28]."

Given the state of the evidence we conclude that Bell "may well have been substantially injured by the error of which he complains." (*People v. Watts* (1926) 198 Cal. 776, 793 [247 P. 884].) It is reasonably probable he might have achieved a more favorable result had the instruction not been given. (*People v. Hannon, supra*, 19 Cal.3d at p. 603; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## DISPOSITION

The judgment is reversed.

McGuiness, P. J., and Parrilli, J., concurred.

A petition for a rehearing was denied May 21, 2004.