Filed 6/16/23  P. Robinson CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> YVONNE DIONNE ROBINSON, <br><br> Defendant and Appellant. | B315942 <br><br> (Los Angeles County Super. Ct. No. BA418953) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa B. Lench, Judge.  Affirmed.

Case Barnett Law, Case C. Barnett for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found former police officer Yvonne Robinson guilty of conspiracy to obstruct justice. On appeal, she contends that the trial court erroneously excluded evidence of the investigating detectives' misconduct in an unrelated case, failed to provide an adequate remedy for the prosecution's alleged discovery violation, and failed to give a unanimity instruction. We reject these contentions and affirm.

## BACKGROUND

I.      Prosecution's case in chief

Robinson was a police officer who, in 2012, worked in the Detective's Youth Services Division of the Long Beach Police Department. Robinson's sister was married to Phillip Jones, whose brother was Prentice Jones (hereafter, Jones). Jones was a self-admitted member of the Insane Crips, a gang in Long Beach that was under a gang injunction.

While investigating the murder of Frank Castro, Long Beach Detectives Todd Johnson and Malcolm Evans became suspicious in 2012 that Robinson was giving confidential information to Jones. During the murder investigation, the detectives wiretapped the phones of various individuals, including Donovan Halcomb. The detectives also released to the public in March 2012 a composite sketch of five people, identified by numbers one through five, whom they believed were involved in Castro's murder. On the evening detectives released the sketch to the public, Robinson and Jones spoke on the phone for about 10 minutes.

After detectives released the sketch to the public, the detectives heard a phone call between Halcomb and Jones on May 16, 2012. In that call, Jones said he was "just now talkin' to

the Police Lady," and she was his "sister in law, that's my brother's wife's sister." "She" told Jones "they really want one and two," and they wanted three, four and five to get to one and two. Jones added that "[s]he said they will use them as a[n] accessory" to murder. The reference to "police lady" alerted detectives to the possibility of a leak in the department. Their investigation of the possible leak led to their discovery that Robinson's sister was married to Jones's brother.

A few weeks after the phone call between Halcomb and Jones, Robinson and Jones called each other on May 31, 2012 nine times and exchanged 12 text messages.

To determine if Robinson was leaking information to Jones, detectives developed a ruse around a recent assault that had happened. In June 2012, James Welch told detectives that his gang had disciplined him for cooperating with the police in an earlier carjacking case. Welch said Jones and Sabrille Acklin, whose gang moniker was Breeze, had beaten him. To see if Robinson would contact Jones about the assault, detectives filed a police report about the Welch assault using true and false details of the crime. The report named suspects, including Jones.

After the report was filed, the authoring detective called Robinson and asked for her opinion about Welch, as Robinson had years before investigated a crime involving him. Robinson told the detective that she did not think Welch would cooperate and that she was already aware of the new case involving Welch. After talking to the detective, Robinson accessed the report about Welch. On June 4, 2012, Robinson and Jones called each other eight times and exchanged five text messages. And on June 24, 2012, Robinson called Jones and told him to meet her at a

specified location. Detectives went to that location and saw Robinson get into a car registered to the mother of Jones's child.

Four days later, Jones told Halcomb during a phone call that there was a rumor going around about "niggas put hands on a nigga" and "now they trying to, everybody who was there, they trying to get them [for] . . . intimidating a witness." When Halcomb said this was "bullshit," Jones replied that this was "for real" and "that's my 'inside connect', you know what I mean."

At the time of these events, Detective Chris Zamora was in charge of coordinating gang injunctions, including facilitating removing gang members from an injunction through an opt-out program. In late May to June 2012, Robinson asked the detective to remove Jones from the gang injunction, telling him that Jones had two young children, was in a stable relationship, was trying to turn his life around, and was willing to remove gang tattoos.

At trial, Ronald Kirkwood, who had been good friends with Jones, testified that Jones said he had a relationship with someone—"a plug"—in the police department.

II.    Robinson's defense

Robinson testified in her defense. She grew up in Long Beach and, at the time of trial, had been a police officer for 13 years. Although her sister is married to Phillip Jones, Robinson does not talk to her sister "in that manner." Robinson knew Jones through her work in youth services and through her other work as an event planner, as Robinson had planned events for Jones's relatives. Also, when Robinson learned that Jones was a rapper, she asked him to perform at community events.

In August 2011, Jones asked Robinson about being removed from a gang injunction, and she told him she would look

4

into a program for that purpose. However, she left it to Detective Zamora whether Jones qualified for the program.

In March 2012, Robinson was at Jones's mother's house to plan a party. While there, Jones showed Robinson the composite sketch that had been released to the public in connection with the murder of Frank Castro. Jones asked Robinson if she knew the people in the sketch, and she said she didn't but that they should turn themselves in. She also told him that if they were at the murder scene they would probably be accessories. She did not tell Jones that she knew who the people were in the sketch but would not tell the police.

In the early part of June 2012 (around the time Welch was beaten), Robinson noticed that Jones's hand was swollen. Jones explained that he had a one-on-one fight with someone because the person had snitched on Jones's friend. When Robinson asked Jones how he knew that, Jones told her he had a police report but wouldn't say how he got it. Robinson told him that if he had assaulted someone for snitching then that could be witness intimidation. She looked up the Welch police report because the detective who authored it asked her to look at it. When she saw that Jones was a suspect in the crime, she thought that Jones had lied to her.

Robinson denied having a romantic or sexual relationship with Jones. She denied showing fellow officer Satwan Johnson a picture of Jones on her cell phone in 2008 and saying she was " 'fooling around' " with Jones.

III.    Rebuttal

Officer Johnson testified that he has been a peace officer for 23 years. He used to be close friends with Robinson, and they had worked together. In 2008, Robinson told him she was having

5

a relationship with a younger man and showed him a picture of the man. Years later, in 2019, Officer Johnson ran into a guy he had grown up with. This guy was with two other men, one of whom Officer Johnson recognized as the person Robinson had said she was seeing in 2008. Although Officer Johnson knew about the charges against Robinson, he thought the case was over and did not mention what he knew to the investigating detectives.

## IV. Verdict and sentence

An information charged Robinson with one count of conspiracy to obstruct justice and alleged 21 overt acts.[1] (Pen. Code,[2] § 182, subd. (a)(5).) A jury found Robinson guilty as charged. On August 25, 2021, the trial court suspended imposition of sentence and placed Robinson on felony probation for two years with various conditions, including that she perform community service.

## DISCUSSION

### I. Exclusion of detectives' testimony

Robinson contends that the trial court abused its discretion and violated her due process rights by excluding evidence of misconduct committed by the two detectives investigating her case. In making this contention, Robinson relies on the written motion she filed in the trial court, which is in the record on appeal. The record on appeal, however, does not

---

[1] Before trial, Jones pleaded guilty to the same crime.

[2] All further undesignated statutory references are to the Penal Code.

6

contain the reporter's transcript from that hearing.[3]  Thus, the only record of the trial court's ruling and its rationale is in the minute order of the hearing, which simply states that the detectives' testimony would not be permitted.

The absence of the reporter's transcript of the hearing means we cannot adequately review Robinson's contention.  That is, we review evidentiary rulings for an abuse of discretion. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884.)  Under the abuse of discretion standard, we will not disturb a trial court's ruling unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.  (*Ibid.*)  Where the issue on appeal involves the abuse of discretion standard of review, the reporter's transcript of the hearing or an agreed or settled statement of it is "indispensable."  (*Hood v. Gonzalez* (2019) 43 Cal.App.5th 57, 79.)

Here, however, the record consists only of Robinson's written motion to introduce evidence concerning the misconduct of Detectives Johnson and Evans in an unrelated murder case. Robinson argued in the motion that evidence of the detectives' misconduct was relevant to show why she was not forthcoming to them when interviewed in this case, to impeach the detectives, and to corroborate Robinson's theory of the case.  As to the specifics of the proposed evidence, the motion suggested that the detectives concealed evidence that their witness to the murder was arrested for a gang-related robbery and that he was released from custody without his case being given to the district attorney

---

[3]     Robinson states in her opening brief that the reporter's transcript of the hearing was "inadvertently omitted."

for filing.  Robinson also submitted with her motion two letters written by Judge Judith Meyer in 2018 to Long Beach's chief of police about an evidentiary hearing regarding the alleged misconduct.  In the first letter, Judge Meyer stated that after the evidentiary hearing, she learned that information exonerating the detectives had not been presented, so it now appeared that the detectives conducted themselves appropriately.  In the second letter, Judge Meyer said that the first letter was a draft and was inadvertently mailed.  The judge clarified that she had no relationship with the detectives and that her rulings were specific to that case and did not reflect her opinion about the detectives' credibility generally.

Robinson's motion does not establish as a matter of law either that the detectives committed misconduct in the unrelated case or the admissibility of any misconduct in this case.  In fact, Judge Meyer's letters suggest that the detectives did not commit misconduct in the unrelated case.  In any event, without knowing what opposition the prosecutor presented to the motion and why the trial court exercised its discretion to deny the motion, the motion by itself is insufficient to overcome the presumption that the ruling is correct and to satisfy Robinson's burden as appellant to present a sufficient record showing reversible error.  (See generally *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573; *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 ["All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown."].)

II.    Discovery violation

This issue concerns Officer Johnson's rebuttal testimony that Robinson had a romantic relationship with Jones.  Robinson

contends that the prosecution untimely disclosed that evidence, and the trial court's remedy for the untimely disclosure was insufficient to protect her right to a fair trial. As we now explain, we disagree.

A. *Additional background*

On the evening of Robinson's testimony on direct examination, the prosecutor told the defense that it had just learned Robinson had been romantically involved with Jones. The next day, the prosecutor explained to the trial court that after Robinson testified, Detective Evans told her to call Officer Johnson. She did so, and that is when she learned about the alleged relationship between Robinson and Jones. The prosecutor thus argued that the evidence went to motive and impeached Robinson, so she wanted to cross-examine Robinson on this issue. And if Robinson denied the relationship with Jones, then the prosecutor wanted to call Officer Johnson.

Defense counsel responded that Officer Johnson was part of the prosecution team and therefore the evidence should have been disclosed earlier.[4] Counsel also argued that the evidence should be excluded, but if it wasn't, a mistrial should be granted or he should be given a continuance to obtain information to impeach Officer Johnson.

The trial court found that the proposed testimony was impeachment evidence, and since impeachment evidence was not necessarily discoverable, refused to exclude it. Instead, the trial

---

[4] However, defense counsel agreed that the prosecutor was unaware of the information until the night before and therefore attributed no misconduct to her.

9

court continued the case for two days to allow the defense to investigate the issue.

###### B. *Trial court did not abuse its discretion*

Timely pretrial discovery promotes ascertainment of truth and prevents trial by ambush. (§ 1054, subd. (a); *People v. Bell* (2004) 118 Cal.App.4th 249, 256.) Discovery in criminal cases is governed by California's statutory scheme, unless otherwise mandated by the federal Constitution or other statutory provisions. (§ 1054, subd. (e).) The statutory scheme requires the prosecution to disclose information in its possession or information it knows to be in the possession of investigating agencies. (§ 1054.1.) Information that must be disclosed includes names and addresses of witnesses the prosecutor intends to call at trial, the defendant's statements, a material witness's felony conviction, exculpatory evidence, and relevant written or recorded statements or reports of witnesses the prosecutor intends to call at the trial. (§ 1054.1, subds. (a)–(f).) Disclosures must be made at least 30 days prior to trial or, if the prosecution obtains discovery within 30 days of trial, immediately. (§ 1054.7.)

If a party fails to comply with its discovery obligations, a trial court may issue any order necessary to enforce the discovery statutes, including immediate disclosure, contempt proceedings, or a continuance. (§ 1054.5, subd. (b).) A witness's testimony may be excluded only if all other sanctions have been exhausted (§ 1054.5, subd. (c)) and there is a showing of significant prejudice and willful conduct motivated by a desire to obtain a tactical advantage at trial (*People v. Jordan* (2003) 108 Cal.App.4th 349, 358).

We review a trial court's discovery rulings for an abuse of discretion. (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 466.)

No discovery violation occurred here. We are first doubtful that Officer Johnson was a part of the prosecution team, as Robinson argues. Officer Johnson was not an express member of the team investigating Robinson, and his mere status as an officer of the Long Beach Police Department does not mean that what he knew about Robinson's relationship with Jones was in constructive possession of the prosecution team. Robinson's reliance on *People v. Lucas* (2014) 60 Cal.4th 153, 273,[5] does not persuade us otherwise. In that case, the prosecution did not disclose a police report about a prosecution witness striking his wife. (*Ibid.*) In discussing whether the prosecution had suppressed the report, the court noted that the police department formed part of the prosecution team such that the prosecution had constructive possession of the report. (*Ibid.*; see also *Aguilar v. Woodford* (9th Cir. 2013) 725 F.3d 970, 980–983 [reports that police dog had a history of mistaken identifications should have been disclosed].) We discern a difference, however, between a police report and Officer Johnson's unreported eyewitness testimony. But even assuming that the prosecution had a duty to disclose Officer Johnson's testimony, the prosecutor did not know about it until after Robinson testified on direct examination. On learning about the evidence, the prosecutor disclosed it "immediately" as required by section 1054.7. (See, e.g., *People v.*

---

[5] Disapproved on other grounds by *People v. Romero and Self* (2015) 62 Cal.4th 1, 53 & fn. 19.

*Mora and Rangel, supra*, 5 Cal.5th at p. 468.) The disclosure therefore complied with the prosecution's discovery obligations.

In any event, the trial court did not err by admitting Officer Johnson's testimony. A witness's testimony should be excluded only if other sanctions have been exhausted. (§ 1054.5, subd. (c).) The trial court accordingly gave the defense a two-day continuance to investigate Officer Johnson. The record does not show that counsel was unable to do so in that time. Nor does the record show that any desire on the part of the prosecutor to obtain a tactical advantage motivated the delayed disclosure. Instead, the prosecutor had no intention of calling Officer Johnson to testify until after Robinson testified. (See, e.g., *People v. Mireles* (2018) 21 Cal.App.5th 237, 248 [no "sandbagging" where prosecutor interviewed witness during trial and immediately provided interview notes to defense].) Indeed, because Officer Johnson was under a *defense* subpoena, clearly the defense knew about him.

Finally, it is unclear whether Robinson is asserting that the prosecutor violated *Brady v. Maryland* (1963) 373 U.S. 83. Although she cites that case, her argument under it is not well-developed. In any event, *Brady* requires the prosecution to disclose to the defense all exculpatory, material evidence known to the prosecution team. Assuming that she is raising *Brady* error, none occurred. Officer Johnson's testimony was not exculpatory. It was inculpatory. Further, the prosecutor did disclose the evidence, albeit not within 30 days of trial. Accordingly, no *Brady* violation occurred. (See, e.g., *People v. Verdugo* (2010) 50 Cal.4th 263, 287 [no *Brady* error where evidence not favorable to defense and was disclosed at trial].)

12

III.   Unanimity instruction

Robinson next contends that the trial court should have sua sponte given a unanimity instruction because some jurors could have believed she made an illegal request to have Jones removed from the gang injunction but not believed she gave Jones confidential information while other jurors could have believed the opposite.  We disagree that a unanimity instruction was required.

A jury verdict in a criminal case must be unanimous. (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 751–752.)  A unanimity instruction prevents a jury from " 'amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' " (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.)  However, "where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was," the jury need not unanimously agree on the theory under which the defendant is guilty. (*Ibid.*)  Stated otherwise, the jury must unanimously agree that a particular crime was committed, but unanimity is not required on how it was committed.  (*Id.* at p. 1135.)

"In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime.  In the first situation, but not the second, it should give the unanimity instruction." (*People v. Russo, supra,*

25 Cal.4th at p. 1135.) In a conspiracy case, the question is whether there were two discrete conspiracies or mere uncertainty as to whether the defendant is guilty of a particular conspiracy. (*Ibid.*) "If only one agreement existed only one conspiracy occurred, whatever the precise overt act or acts may have been." (*Ibid.*)

The trial court must give a unanimity instruction sua sponte where the circumstances of the case require one. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877.) We review questions of instructional error de novo. (*People v. Sorden* (2021) 65 Cal.App.5th 582, 616.)

Here, Robinson was charged with and there was evidence of only one discrete crime: Robinson conspired to obstruct justice by giving Jones confidential police information. In furtherance of that conspiracy, Robinson's overt acts included calling Jones and exchanging texts with him, trying to get Jones removed from the gang injunction, and communicating with him about the Castro murder investigation and the Welch police report. Indeed, some of those overt acts were not crimes; for example, Robinson's overt act of merely calling or texting Jones was not criminal but was evidence of the conspiracy. (See *People v. Epps* (1981) 122 Cal.App.3d 691, 703 [series of acts individually considered may not amount to a crime, but cumulative effect is criminal].) The prosecutor thus explained that the overt acts "are not in and [of] themselves crimes" and only one of them needed to be found true.

And contrary to Robinson's argument, the jury did not have to agree on a specific overt act to find her guilty of conspiracy. (*People v. Russo, supra*, 25 Cal.4th at p. 1128.) The prosecutor's closing argument was consistent with this single theory of the crime. She argued that Robinson was guilty of conspiracy to

14

obstruct justice by giving confidential information to Jones and that an element of the crime was Robinson committed an overt act in furtherance of the conspiracy. Thus, at no time did the prosecutor argue that there was more than one conspiracy. A unanimity instruction was not warranted.

**DISPOSITION**

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

HEIDEL, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15